Joscelyn CATON, et al., Plaintiffs,

v.

**CANAL ZONE GOVERNMENT,**
Defendant.

Civ. No. 77–0195–B.

United States District Court,
D. Canal Zone,
Balboa Division.

Oct. 1, 1981.

**2**

Pierce & Kiyonaga, David J. Kiyonaga, Balboa, Republic of Panama, for plaintiff.

Frank J. Violanti, U.S. Atty., A.P.O. Miami, Republic of Panama, for defendant.

JOHN R. BROWN, Circuit Judge: *

Plaintiffs Caton and Shepherd filed the present civil action against their former employer, the Canal Zone Government,[1] on May 25, 1977, alleging that they (and others similarly employed by the Fire Division) are the victims of discrimination on account of their race (black) and citizenship or national origin (Panamanian). For relief, they asked for both compensatory damages, including back-pay, and temporary and permanent injunctions requiring the defendant to modify the compensation schedules for nonsupervisory Fire Division personnel. For the reasons detailed below, judgment shall be entered for the defendant.

* Circuit Judge of the Fifth Circuit Court of Appeals, sitting by designation.

1. Under the Panama Canal Act of 1979, Pub. Law.No. 96–70, § 3(b)(3)–(4), "Canal Zone Government" is deemed to refer to the "United States of America." District Judge Sear, in a minute entry dated November 19, 1979, granted plaintiffs in this action leave to amend and substitute the United States as defendant, as well as leave to join the Panama Canal Commission (or "Governor of the Canal Zone") and

*Introduction*

Prior to 1956, firefighting responsibilities in the Canal Zone were divided among the various civilian and military components operating in the area. All firefighters were U.S. citizens. During 1956, the Canal Zone Government assumed the entire responsibility for firefighting in the Canal Zone. Facilities were consolidated, and nonsupervisory firefighter positions were opened to non-U.S. citizens. Significant savings resulted because the non-U.S. citizens were paid at local wage rates.

When the 1955 Treaty of Mutual Understanding and Cooperation Between the United States of America and the Republic of Panama and its attached Memorandum of Understandings Reached[2] were ratified, the United States became obligated to a single wage system in the Canal Zone, which forms the basis of plaintiffs' complaint. Plaintiffs bring the present action primarily under Title VII to have the local pay base raised. Additionally, the plaintiffs challenge the promotional system that, for statutorily defined security reasons, limits certain supervisory positions to U.S. citizens. Various races and nationalities are present in the class that the plaintiffs represent.

This case stems from the employment in 1956 of approximately 120 Panamanians by the Canal Zone Fire Division. Upon discovering that they were being paid less than their U.S. counterparts, these Panamanian firefighters, or more properly, their representatives, began a series of administrative complaints to the Governor of the Canal Zone, the Canal Zone Board of Ap-

the Secretary of the Army. On February 11, 1980, Judge Sear denied defendant's motion to dismiss for failure to join the Secretary of Army, holding that the Secretary is not an indispensable party. The present defendants include the United States as substitute for the Canal Zone Government, and the Panama Canal Commission.

2. 6 U.S.T. 2273, T.I.A.S. No. 3297, codified at 72 Stat. 405 (1958).

peals, the Civil Service Commission, the Civilian Personnel Coordinating Board, and the Secretary of the Army. Even now, the plaintiffs come into this District Court with a multiplicity of claims and numerous grounds for recovery. Compounding the complexity of the issues raised is the difficulty in ascertaining the class bringing this suit. Moreover, the procedural and substantive issues raised in this controversy span a period of over 20 years, beginning with the alleged discrimination in 1956, continuing to the present.

Briefly, the claims involve discrimination on the basis of race or national origin, back-pay damages because of an alleged unauthorized (and hence unfair) pay scale, and a challenge to a claimed discriminatory scheme for promotion of firefighters to Fire Sergeant. In the remainder of this opinion, this Court will attempt to identify and isolate each of the plaintiffs' various claims and grounds for recovery, and each claim will be ruled on separately.

### The Class Defined

By order of this Court on March 6, 1981, this matter was certified as a class action, the class consisting of nonsupervisory firefighters, including the following subclasses: (i) Black Panamanians, (ii) Black U.S. citizens, (iii) Hispanic Panamanians, (iv) Caucasian U.S. citizens, (v) Caucasian Panamanians, and (vi) Hispanic U.S. citizens. The class consists of approximately 176 black Panamanians, 21 Hispanic Panamanians, 6 black U.S. citizens, 3 Caucasian U.S. citizens, 3 Hispanic U.S. citizens, and 1 Caucasian Panamanian. Members of the class at various times have worked for the Fire Division during the period 1956 to at least 1975. The U.S. citizens in the class were naturalized after employment.

In light of the plaintiffs' claim for back-pay, the class seems appropriate. However, the class is problematic from the perspective of plaintiffs' discrimination allegations, because it includes all firefighters, without respect to their race or citizenships. This difficulty merits further analysis.

### Charting These Troubled Seas

The opinion that follows is often as complex and difficult as the facts forming the basis for this lawsuit. It is thus helpful, at the outset, to outline the nature and direction of this Court's analysis.

For convenience, this opinion will be divided into two sections. Section I deals with the entire class's claim that the locally hired firefighters in 1956 were underpaid. Within this generic back-pay claim lies the claim that the reason the class was underpaid was that the vast majority of the locally hired firefighters were black by race, Panamanian by citizenship, and West Indian by national origin. This Court will treat the certified class *as if* all members share in all of its general complaints. However, it should be noted that the white U.S. citizens' only discrimination claim is that they were paid less because hired locally. The single white Panamanian's claim could conceivably be based on both citizenship and the fact that he was hired locally. The Hispanic U.S. citizens' claim is apparently limited to disparate treatment because they were locally hired, because no allegations have been made regarding discrimination toward Hispanics. The six black U.S. citizens share in this general claim on the basis of race, but these six also have a separate and identifiable claim that this Court will deal with separately. The Hispanic Panamanians share in the claim of wage discrimination on the basis of local hiring, and possibly citizenship or national origin. Finally, the greatest number of plaintiffs (176) are the black Panamanians who claim that they were discriminated against in an unfair wage system, giving as reasons the facts that they were hired locally, are black, are Panamanian citizens and are of West Indian national origin. Since all of the smaller subclasses share in one or more of the large subclass's allegations, the allegations of this largest subclass will be the primary target of this Court's analysis.

Section I begins with the historical background of the present lawsuit and identifies several stumbling blocks along the way to the merits of a claim for back-pay or wage

discrimination. These include the six-year statute of limitations, the fact that the District Court of the Canal Zone is not a Constitutional Court under the Tucker Act, and the fact that Title VII provides the exclusive remedy for the plaintiffs' claims, thus eliminating many of the statutory, Treaty, and Constitutional grounds under which the plaintiffs bring this suit. Concluding that Title VII is the proper basis for the plaintiffs' claim, this Court next addresses the procedural roadblocks on the way to a consideration of the merits of their Title VII claim. At the end of Section I, this Court, by entertaining several assumptions in favor of the plaintiffs' claim, reaches the merits of their Title VII action, and finds neither discrimination nor violations, statutory or under the treaties, on which the plaintiffs might prevail.

Section II addresses the plaintiffs' second major claim that they were discriminated against by a promotion system that prevented non-U.S. citizens from holding supervisory positions. This claim includes the allegation that the establishment of "security positions" (open only to U.S. citizens) was a discriminatory tool used by the Canal Zone Government. Obviously, the three subclasses of U.S. citizens do not share in this claim. Following this Court's conclusion that the "security positions" were necessary and statutorily justifiable, the unique claim of the six black U.S. citizens regarding promotion will be addressed.

In light of the probability that this Court's decision will be appealed to the Fifth Circuit Court of Appeals, and retrial, if ordered, could not be had before the closing of the District Court for the Canal Zone, the following opinion will be structured so as to cover exhaustively all possible claims of the plaintiffs, as well as all possible avenues of recovery. In this way, this Court hopes to avoid the necessity for a remand to a trial court.

Structuring the opinion in this fashion for possible appellate review necessarily entails a lengthier opinion. However, the necessity of resolving all litigation in this Court by April 1, 1982, compels this Court patiently to address as many actual and potential issues as possible.

## I.

### Historical Background

In 1956, the various fire departments in the Canal Zone consolidated into a Fire Division. Before 1956, the non-supervisory firefighter positions were filled by U.S. citizens who were being paid wage rates based on District of Columbia firefighter wages. For obvious economic and political reasons, firefighter positions were opened up to Panamanians, and following a recruitment effort, approximately 1,700 applicants came forward, out of whom approximately ten percent were employed. Because English proficiency was required, almost all of those selected were black Panamanians (many blacks came to Panama during the building of the canal and stayed on). The pay that these new firefighters were receiving was considerably less than that received by the small number of U.S. citizens who had been previously employed as firefighters and were retained, doing the same work as the new Panamanian firefighters. Therein began the present conflict.

The plaintiffs argue that Public Law No. 82–207 (P.L. 207), enacted in 1951, reinforced the policy that since the inception of Canal Zone, all civil function positions, including firefighters, were to be paid District of Columbia wage rates.[3] They concede that P.L. 207 was repealed in 1958 when Public Law No. 85–550 (P.L. 550) was enacted.[4] However, the plaintiffs argue,

---

3. Pub.L. 82–207, 65 Stat. 637 (1951):

    [The] Governor of the Canal Zone is authorized and directed to grant additional compensation to policemen, firemen, and school teachers employed by the Canal Zone Government, *whenever additional compensation is granted to employees in the District of* Columbia employed in similar or comparable positions.
    Pub.L.No.82–207, § 1(c).

4. Pub.L.No.85–550, 72 Stat. 405, approved July 25, 1958 codified at 2 C.Z.C. § 141 *et seq.* (1962 ed.):

    *§ 144. Compensation*

the Canal Zone Government created a local wage rate for the Fire Division in the non-supervisory ranks in 1956, contrary to the existing law and practice, and *before* any repeal of P.L. 207. This Court recognizes that there are at least arguable merits in a claim for back-pay covering the period between 1956, when the local firefighters were hired, and 1958, when P.L. 550 was approved. Such an action is recognized as an implied employment contract claim under the Tucker Act, 28 U.S.C. 1346 *et seq. See Sheehan v. Army & Air Force Exchange Service*, 619 F.2d 1132, 1137–38 (5th Cir. 1980). This apparent avenue of recovery for the plaintiffs, however, is cluttered with blockades that this Court will confront but cannot overcome.

### Statute of Limitations

■ First, such a claim is restricted by the six-year statute of limitations in 28 U.S.C. § 2501. *See also* 28 U.S.C. § 2401. Beginning with an assumption most favorable to plaintiffs that their claim for back-pay did not accrue until July 25, 1958, when P.L. 550 was approved, we find that the original plaintiffs in this action, Caton and Shepherd, filed this action on May 25, 1977, well beyond the six-year statute of limitations.

### No Tucker Relief

■ Even hurdling the statute of limitations, there is for this ancient two-year claim (1956–58), or even the later claims asserted, no jurisdiction in the United States District Court for the Canal Zone under the Tucker Act.

(a) The head of each department . . . shall establish and from time to time may revise, the rates of basic compensation for positions and employees under his jurisdiction.
(b) The rates of basic compensation may be established and revised in relation to the rates of compensation for the same or similar work performed in the continental United States or in such areas outside the continental United States as may be designated in the regulations referred to in section 155(a) of this title.
2 C.Z.C. § 144.
§ 145. *Uniform Application of Standards and Rates*

The Tucker Act, 28 U.S.C. § 1346 *et seq.*, provides that district courts shall have concurrent original jurisdiction with the Court of Claims of civil actions against the United States, for amounts not exceeding $10,000. 28 U.S.C. § 1346(a)(2). Thus, an additional difficulty arises because most, if not all, of the plaintiffs' claims are over $10,000. But this difficulty fades into insignificance because of our conclusion that the District Court for the Canal Zone is not one of the district courts under the Tucker Act, except for tort claims under the Federal Tort Claims Act, not here applicable (§ 1346(b)).

Therefore, assuming for the sake of the plaintiffs' claim that the United States through the Canal Zone Government was in violation of P.L. 207, and even assuming that somehow the six-year statute of limitations could be overcome by plaintiffs,[5] this Court does not have jurisdiction to entertain such an action.

Under *Wells v. United States*, 214 F.2d 380, 382–83 (5th Cir. 1954), the District Court for the Canal Zone is not one of the Constitutional [District] Courts referred to in 28 U.S.C. § 1346(a)(2). For the present action, *Wells* means that this Court is not permitted to entertain an action brought against the United States for the recovery of wages. By virtue of the doctrine of sovereign immunity, the United States cannot be sued without its consent, that is, without specific statutory authorization. Insofar as the complaint may be construed to allege a wage claim against the United States for violative pay rates, the suit is barred by the doctrine of sovereign immuni-

The established employment standards and rates of basic compensation established pursuant to [§] 144 of this title shall be applied uniformly, irrespective of whether the employee or individual concerned is a citizen of the United States or a citizen of the Republic of Panama.
*Id.* at § 145.

5. The plaintiffs suggested at trial that as long as a claim is ongoing, and administrative remedies are being exhausted, the statute would be tolled. We are giving the plaintiffs this favorable interpretation, without regard to its merits, in our present holding.

ty from being heard in this Court. Specifically, the District Court for the Canal Zone is not one of the District Courts to which reference is made in Section 1346(a)(2). *See Drummond v. Bunker*, 560 F.2d 625 (5th Cir. 1977); *Leber v. Canal Zone Central Labor Union & Metal Trades Council AFL–CIO*, 383 F.2d 110 (5th Cir. 1967), *cert. denied*, 389 U.S. 1046, 88 S.Ct. 769, 19 L.Ed.2d 838 (1968). Although this Court has heard cases involving pay claims of Panama Canal Company employees, such actions have been brought by virtue of that Company's status as a government corporation. *See, e. g., Reinheimer v. Panama Canal Company*, 413 F.2d 153 (5th Cir. 1969); *Aparicio v. Swan Lake*, 643 F.2d 1109, 1114 n.8 (5th Cir. 1981). The Canal Zone Government, on the other hand, was an independent agency of the United States, and thus immune from suit except as expressly provided by statute.

### No Wage Violation 1958–Present

As to the plaintiffs' claim for wages after P.L. 207 was repealed, this Court finds no remediable wage violation by the United States. Any nonsupervisory firefighter, without respect to his race or citizenship, came to work at the local rate after 1956. The plaintiffs argue that the 1955 Treaty and Memorandum of Understanding, discussed *infra*, should be interpreted to say that Panamanians would receive the same pay as U.S. citizens for identical work done. Thus they assert a continuing wage rate violation over the past 25 years. The same sovereign immunity and jurisdictional problems discussed above, however, are present here. Thus, by necessity, the plaintiffs must seek a different avenue of recovery.

### No Relief Under § 1981

The plaintiffs next urge that 42 U.S.C. § 1981 is a basis for their recovery. More specifically, the claim is that they were discriminated against upon the basis of national origin and race.

▪ A lion in the street is the Supreme Court's opinion in *Brown v. GSA*, 425 U.S. 820, 96 S.Ct. 1961, 48 L.Ed.2d 402 (1976), in which Section 717 of the Civil Rights Act of 1964 was declared the exclusive judicial remedy for claims of discrimination in federal employment. The plaintiff in *Brown* filed an employment discrimination suit, alleging jurisdiction under (i) Section 717 of the Civil Rights Act of 1964, (ii) 28 U.S.C. § 1331, (iii) 28 U.S.C. §§ 2201, 2202, and (iv) 42 U.S.C. § 1981. *Id.* at 823–24, 96 S.Ct. at 1963, 48 L.Ed.2d at 406. In reaching its conclusion that Section 717 provides the exclusive judicial remedy for such discrimination claims, the Supreme Court observed that Congress' intent in 1972 in amending the Civil Rights Act "was to create an exclusive, pre-emptive administrative and judicial scheme for the redress of federal employment discrimination." *Id.* at 829, 96 S.Ct. at 1966, 48 L.Ed.2d at 409.

Notably, the class of plaintiffs in the present action, like the plaintiff in *Brown*, assert that this Court has jurisdiction over the subject matter of their suit on multiple grounds, including 28 U.S.C. §§ 1331, 1343, & 2201; 42 U.S.C. § 1983; the Fifth and Fourteenth Amendments to the U.S. Constitution; the 1955 Treaty of Mutual Understanding and Cooperation entered into between the U.S. and Panama; and the 1955 Treaty's attached Memorandum of Understandings Reached. Under the holding in *Brown, supra*, none of these statutes provides a basis for this Court to assume jurisdiction over the subject matter of this suit, except in strict accord with the requirements of Title VII, made applicable to governmental employees by its 1972 amendments. *See Swain v. Hoffman*, 547 F.2d 921, 923 (5th Cir. 1977) (summary judgment against plaintiff on his § 1981 action because § 717 provides exclusive remedy); *Porter v. Adams*, 639 F.2d 273, 278 (5th Cir. 1981) (Fifth Amendment action no longer available because § 717 is exclusive remedy). Although the plaintiffs in the present action do not concede that § 717 is their *exclusive* remedy, they do argue that § 717 "should be determinative of the issues" in the present controversy. The defendants in the present action argue that the instant claim should be considered only in light of

§ 717. This Court will thus, on the basis of *Brown*, turn its attention to Title VII and begin an analysis of the plaintiffs' claims under the provisions of § 717.

### Title VII: Procedural Contours

Section 717, codified at 42 U.S.C. § 2000e–16, was included in the 1972 amendments to Title VII of the Civil Rights Act of 1964. It provides that all personnel actions affecting government employees shall be free from any discrimination based on race, color, religion, sex, or national origin. 42 U.S.C. § 2000e–16(a). But it does much more. It establishes precise machinery and methods for initiating, processing, and deciding on appeal claims of violations by governmental employees and is geared to the peculiar problems of governmental employment.

On February 11, 1976, prior to the filing of the present suit in this Court, a "third party complaint" was filed with the Canal Zone's Director of Equal Employment Opportunity (EEO) by the plaintiffs' attorney. The complaint alleged that (i) the rates of pay for nonsupervisory firefighters were unlawfully established as a result of discrimination in violation of Title VII, and (ii) that Black Panamanian firefighters of West Indian origin were denied promotional opportunities in violation of Title VII.[6] The Canal Zone Government's EEO office investigated the allegations and, upon determining that there had been no discrimination, informed plaintiffs' attorney of their finding on July 20, 1976.[7] A serious question arises as to whether the third party allegations provide any basis upon which the present action may be pursued. Section 717(c)[8] requires that the plaintiffs exhaust their administrative remedies as a jurisdictional prerequisite to the filing of a Title VII lawsuit. The Civil Service Commission Regulations provide that agencies shall set up two different administrative procedures to deal with discrimination complaints. *See* 5 C.F.R. §§ 713.211–.222, .251 (1977). The first procedure is to cover processing, investigation, hearing, determination and administrative review of a complaint of discrimination by an individual employee. *Id.* §§ 713.211–.222. The second is to cover a review of personnel policies at the request of "third parties."[9] The Regulations also

---

**6.** Although this complaint alleged discrimination in promotion generally, the specific promotion complaint of the six black U.S. Citizens, a subclass in the present class, will be dealt with separately *infra* in light of their own Title VII complaint instituted in October, 1972.

**7.** Throughout the course of the plaintiffs' administrative complaints and this litigation, the allegation of discrimination on the basis of citizenship (Panamanian) has been raised. The Canal Zone EEO office, in its reply and investigation, ignored the claim of discrimination on the basis of citizenship, and considered the claim as one based on race and/or national origin. To the extent that Title VII does not address discrimination on the basis of citizenship, a point that this Court will discuss later in this opinion, the allegations of the plaintiffs in terms of citizenship will likewise be ignored by this Court.

**8.** 42 U.S.C. § 2000e–16(c):
Within thirty days of receipt of notice of final action taken by a department, agency, or unit referred to in subsection (a) of this section, or by the Civil Service Commission upon an appeal from a decision or order of such department, agency, or unit on a complaint of discrimination based on race, color, religion, sex or national origin, brought pursuant to subsection (a) of this section, Executive Order 11478 or any succeeding Executive orders, or after one hundred and eighty days from the filing of the initial charge with the department, agency, or unit or with the Civil Service Commission on appeal from a decision or order of such department, agency, or unit until such time as final action may be taken by a department, agency, or unit, an employee or applicant for employment, if aggrieved by the final disposition of his complaint, or by the failure to take final action on his complaint, may file a civil action as provided in section 2000e–5 of this title, in which civil action the head of the department, agency, or unit, as appropriate, shall be defendant.

**9.** 5 C.F.R. § 713.251:
*Third party allegations of discrimination*
(a) COVERAGE. This section applies to general allegations by organizations or other third parties of discrimination in personnel matters within the agency *which are unrelated to an individual complaint of discrimination subject to §§ 713.211 through 713.222.*
(b) AGENCY PROCEDURE. The organization or other third party shall state the allegation with sufficient specificity so that the agency may investigate the allegation.

require agencies to establish a procedural mechanism for handling complaints by employees who believe that reprisal actions have been taken against them for filing a complaint. *See* 5 C.F.R. §§ 713.261–.262 (1977). Under this regulation, an employee can either file a new individual complaint, or file a charge of reprisal and proceed under specific "reprisal" regulations. *Id.* If the employee files a new complaint, a written notice of final adverse action would give rise to the right to file a civil suit within 30 days. If an employee files a charge of reprisal, the agency is required to investigate the charge, after which the agency may take action and report to the Civil Service Commission, or in the absence of action or adverse action by the agency, the complainant may appeal directly to the Civil Service Commission. *Id.*

The Fifth Circuit in *Porter*, 639 F.2d 243, held that the filing of a charge of reprisal does not provide a route to judicial review. 639 F.2d at 276. The reprisal procedure is an alternative to the filing of an individual complaint, and provides quicker redress than the formal complaint procedure. 639 F.2d at 277. The victims of reprisal simply have a choice between "the opportunity for an expedited administrative resolution of their grievances without judicial review, and . . . the opportunity for judicial review but only after more protracted administrative proceedings." *Id.* The employee who is not satisfied with the results of a reprisal procedure may still file a formal complaint that would lead to a civil action. *Id.*

The Government here urges that the rationale in *Porter* regarding reprisal actions is equally applicable to the handling of allegations of discrimination by third parties. The third party allegation procedure provides a shortcut, not unlike the reprisal procedure, and allows resort to the Civil Service Commission in the same manner as a reprisal action. Illustrating the sharp distinction between an individual complaint and a third party complaint is the Sixth Circuit's opinion in *James v. Rumsfeld*, 580 F.2d 224 (6th Cir. 1978). The Court specifically held that the use of a third party allegation was not an appropriate exhaustion of administrative remedies for an individual complaint to give the Court jurisdiction over the claim. The plaintiffs' allegations of discrimination in the present case were presented to the agency in the form of a "third party complaint".[10] Following the tracking of *Porter* and *Rumsfeld, supra*, and the construct of the regulation, there is no right of judicial review of administrative action in this suit. So holding, ordinarily the case would end there.

---

The agency may require additional specificity as necessary to proceed with its investigation. The agency shall establish a file on each general allegation, and this file shall contain copies of all material used in making the decision on the allegation. The agency shall furnish a copy of this file to the party submitting the allegation and shall make it available to the Commission for review on request. The agency shall notify the party submitting the allegation of its decision, including any corrective action taken on the general allegations, and shall furnish to the Commission on request a copy of its decision.

(c) COMMISSION PROCEDURES. If the third party disagrees with the agency decision, it may, within 30 days after receipt of the decision, request the Commission to review it. The request shall be in writing and shall set forth with particularity the basis for the request. When the Commission receives such a request, it shall make, or require the agency to make, any additional investigations the Commission deems necessary. The Com-

mission shall issue a decision on the allegation ordering such corrective action, with or without back pay, as it deems appropriate. (emphasis supplied)

**10.** The plaintiffs' attorney specifically entitled his complaint, attached to a letter to the EEO Director, a "Third Party Complaint and Request for Investigation." Investigation is, notably, the principal step in processing third party allegations. There was no request for consultation with an equal employment opportunity counselor, which is the principal step in processing individual complaints. The allegations set forth were general in nature and suited to resolution by the third party procedure. Indeed, the agency informed plaintiffs' attorney that the charges would be considered under third party procedures. *See* 5 C.F.R. §§ 713.-231(a), .251(b); Letter of April 2, 1976, from the Canal Zone director of EEO to plaintiff's counsel, "Exhibit 2" of Government's Exhibit No. 1.

However, in order to consider the present complaint in a light most favorable to the plaintiffs and to insure complete appellate review and direction, this Court will assume that their "third party complaint" was adequate to constitute a complaint on behalf of each individual.[11] The present analysis will thus proceed on the assumption that the plaintiffs have exhausted their administrative remedies and that they have pursued a route entitling them to judicial review.

### Out-of-Time Again

■ Even assuming their administrative remedies have been exhausted, the plaintiffs face the formidable obstacle of failing to file the present action within 30 days of receipt by the third party of notice of final agency action. *See* 42 U.S.C. § 2000e–16(c). The plaintiffs' attorney filed a "third party complaint" on March 5, 1976, and the agency began an investigation in accordance with its regulations. The plaintiffs' attorney was notified in writing on February 9, 1977, of the agency's decision. The present suit was filed in this Court on May 25, 1977, over three months later.

The Government argues that since the plaintiffs' attorney was submitting a third party complaint with the agency, he was clearly the person to whom notice should have been given. However, consistent with the assumption that the third party complaint may be construed as a complaint by individuals, this Court has to recognize that the 30-day period is triggered by receipt of notice by the complainant, and not by the complainant's attorney. *See REA v. Mid-*

*dendorf,* 587 F.2d 4 (6th Cir. 1978); *Craig v. Department of Health, Education and Welfare,* 581 F.2d 189 (8th Cir. 1978); *Bell v. Brown,* 557 F.2d 849 (D.C.Cir.1977). *Compare Decker v. Anheuser-Busch,* 632 F.2d 1221 (5th Cir. 1980) (pending en banc rehearing). In this construction, the conclusion is inevitable that the notice requirements were never formally complied with by the agency.[12] Because of this, the present suit may be considered simply premature, meriting dismissal and the inevitable filing within 30 days of this Court's order, only to begin again the controversy which has raged for a quarter of a century. Since the individuals for whom all of this effort was being made have now been identified in the class certification, this Court assumes that the premature filing has now matured in compliance with the 30-day requirement.[13] Again, this assumption is necessary for this Court to reach the merits.

### At Long Last—The Merits of the Title VII Claim

Both parties to this dispute concede that Title VII does not apply to government employees in the Canal Zone before March 24, 1972. For the years between 1956 and 1972, we have already concluded that the plaintiffs have no claim for back-pay for lack of Tucker Act jurisdiction, the doctrine of sovereign immunity, and the statute of limitations (filed after July 25, 1964, six years after July 25, 1958, when P.L. 550 was passed and their back-pay claim for 1956–1958 accrued). From March 24, 1972, to the present, the exclusive basis for the plain-

---

**11.** Disregarding the fact that the third party complaint did not list the firefighters or those now pressing this suit and, at best, had only a dozen or so affidavits of individual firemen, the plaintiffs next claim that the third party allegation provided the only avenue of redress in 1975, because the Canal Zone EEO held that § 717 did not apply to aliens in the Canal Zone. Since this was the local administrative policy until it was changed much later in Washington, D.C., and is now confirmed by the Department of Justice direction to the United States Attorney as counsel here, this is all the more reason to indulge our tentative assumption arguendo that the complaint was sufficient.

**12.** Indeed, from the structure of the "third party complaint" and the limited number of attachments, the agency would have no way of identifying potential parties to be notified. This fact bolsters our decision that this was a third party allegation and not, as assumed *arguendo,* one for individual complaints.

**13.** This assumption does not apply to the specific Title VII action of six black U.S. citizens who, although members of the class in general, claim that they were discriminated against on the basis of race and national origin in the promotion selection process. This action was a separate EEO complaint, and will be discussed *infra.*

tiffs' discrimination suit is Title VII of the Civil Rights Act of 1964, as amended.

Both sides in the present controversy recognize the applicability of Title VII to the plaintiffs' post-1972 claim. In response to a specific request by this Court for an authoritative position by the United States, the Department of Justice instructed the United States Attorney to take the position that aliens employed in the Canal Zone are subject to the terms of Title VII, because the Civil Rights Act of 1964, as amended, defines the terms "state" to include the Canal Zone. 42 U.S.C. § 2000e(i). At the outset, we point out there are two Title VII claims. We deal first with the claim of wage discrimination.[14] The plaintiffs contend that they were discriminated against not because of their citizenship, but because of their color and national origin as Panamanians and West Indians.[15] They claim that their national origin and color made them subject to pay scales that were not equal to the pay received by U.S. citizens performing the same work. This claim, which effectively comes into being in 1972, has as its origin the employment facts of 1956, and the 1955 Treaty and Memorandum of Understandings, and its implementing legislation. A brief overview of the Treaty under which the plaintiffs primarily bring their claim is helpful to an understanding of this controversy.

### 1955 Treaty and Memorandum

In 1955, the President of the United States sent to the U.S. Senate Committee on Foreign Relations the Treaty of Mutual Understanding and Cooperation Between the United States of America and the Republic of Panama. Following the thirteen articles is a Memorandum of Understandings Reached that deals with various administrative and policy matters that became effective when the Treaty entered into force. There can be no question about the validity or applicability of the attached Memorandum of Understandings since this was enacted verbatim in P.L. 550 and is now codified in 2 C.Z.C. § 141 et seq. Item 1 of the Memorandum addressed the problem raised in the present lawsuit. The Canal Zone Government, as well as the Panama Canal Company, historically divided employment positions into two categories, namely, U.S. rate and "local rate." Non-U.S. citizens were eligible for some U.S. rate positions, if qualified, and were paid at the same rate as U.S. citizens but without the overseas and tax differentials provided for U.S. citizens. This separation of positions gave rise to this claim of discrimination.

Item 1 set forth precepts to govern the labor practices of all U.S. agencies in the Canal Zone, summarized as follows:

(a) All positions will have a basic wage level, the same for all employees without regard to citizenship. A U.S. citizen, however, will be paid an overseas differential plus an allowance for those elements which operate to reduce the disposable income of such an employee as compared with a resident of Panama.

(b) Legislation will be sought for uniform application of the Civil Service Retirement Act in all government positions in the Canal Zone.

(c) Equality of opportunity will be afforded to all government positions without regard to citizenship except where security factors serve to make undesirable the employment of non-U.S. citizens.

(d) Panamanian citizens will be afforded opportunity to participate in training programs conducted for U.S. employees in the Canal Zone.

The above policies, when implemented, were to eliminate discrimination against Panamanians vis-a-vis U.S. citizen employees.

---

14. The specific claim concerning promotion to Sergeant and the "security" requirement is dealt with later in this opinion.

15. The original EEO investigation recognized as "West Indian" the national origin of plaintiffs. Throughout this litigation, plaintiffs have contended that their "national origin" is Panamanian.

During the Senate hearings on the Treaty, Henry F. Holland, Assistant Secretary of State for Inter-American Affairs, explained that

we have agreed, subject to the enactment of the necessary legislation by the Congress, to the establishment of a single basic wage level for all employees in a given category regardless of citizenship, with certain increments to be added to the pay of a United States citizen employee; to uniform application of the Civil Servant Retirement Act . . . ; [and] to equality of opportunity for Panamanian citizens for employment in all United States Government positions in the zone for which they are qualified except where security considerations require the employment of United States citizens only . . . .

Treaty of Mutual Understanding and Cooperation with the Republic of Panama: Hearings Before the Senate Committee on Foreign Relations, 84th Congress, 1st Sess. (1955), at page 44.

In response to a question by Senator Aiken, Mr. Holland stated that he believed "that the Panamanian employees will [be paid more] in many cases where they have heretofore been paid less than the salary of the United States citizen performing the same work." *Id.* at 52.

George H. Roderick, Assistant Secretary of the Army (Civil Military Affairs), emphasized that the commitment to a single wage system did not require that Panamanians in all jobs be paid at the U.S. rates of pay for comparable jobs. *Id.* at 70. "It merely requires that the basic wage, whether a United States rate or a locality rate, apply alike to United States citizens and citizens of Panama occupying identical positions, without discrimination, subject to the agreed overseas differential and increments." *Id.* at 70–71. "In other words, it could be very easily conceived that if he is not correctly informed a Panamanian may think he is going to get United States rates from here on out on every job, which is not true." *Id.*

Senate Bill 85–1850, to carry out the commitment to enactment of legislation, expressly incorporated the above Memorandum of Understandings Reached attached to the 1955 Treaty. This became P.L. 550, codified at 2 C.Z.C. § 141 *et seq.*

### Treaty Analysis

The first principle set forth in the 1955 Memorandum is that the basic wage for any given grade level is to be the same for any employee eligible for appointment without regard to citizenship.[16] The single wage system envisioned in the 1955 Memorandum, and enacted in P.L. 550, was not intended to be a system whereby Panamanians in all jobs were to be paid at U.S. rates. Testimony before the Senate Committee on Foreign Relations on the 1955 Treaty recognized a long-established practice and policy of fixing the pay of particular occupational categories on the basis of prevailing rates in the area of recruitment. Secretary Holland, Hearings Before the Senate Committee on Foreign Relations, *supra*, at page 182. For jobs which had to be recruited in the United States, it was evident that wage rates specified would have to be such as to attract qualified applicants. For jobs which could be recruited locally, the local rate was all that, in prudence, had to be afforded. The single wage system was intended to continue this policy. If recruitment in the United States was required, the United States wage rate would apply. If recruitment could be done in Panama the local wage rate would apply. "The commitment [to the single wage system] does not require that Panamanians be paid at the United States rates of pay in all jobs. It does not in any way preclude the continued use of locality rates of pay . . . . It merely requires that the basic wage, whether a United States rate or a locality rate, must be applied alike to United States citizens and citizens of Panama occupying identical posi-

---

**16.** An exception is found where U.S. citizenship is required for security reasons, to be discussed *infra.*

tions, without discrimination. . . ." Secretary Roderick, *Id.* at pages 70–71.

The plaintiffs' greatest burden, and their greatest difficulty, in the present action is to prove a violation of the above principles. At trial, the plaintiffs were unable to demonstrate that Panamanian citizens or black persons in a particular job were ever paid a lower basic wage than U.S. citizens or white persons hired after 1956 in the same job. The only exceptions, who were no longer present after 1968, were those few U.S. citizens who remained in firefighter positions after Panamanians became eligible to fill such positions and who by Congressional direction were "grandfathered" at U.S. rates. Such a "freezing" of higher rates was explicitly authorized by P.L. 550, *supra*, codified at 2 C.Z.C. § 150.[17]

### Discrimination Not Shown

■ Except for the different pay to the "grandfathered" U.S. citizens, the rate of pay to Panamanians, of whatever race, color, or nationality, has been and is the same for United States citizens of whatever race, color, or nationality, hired as firefighters after 1956. There is no discrimination in hiring or rates of pay. The only difference is that between the District of Columbia wage rates and that prescribed in the Canal Zone.

This Court finds that the Canal Zone Government had the right under P.L. 550 to establish two basic classifications. On the one hand were those jobs which required recruitment in the United States. These would be paid U.S. salaries including several differentials. On the other hand were those jobs which could be filled by local recruitment. These would receive local rates of pay as prescribed by the Canal Zone Government. P.L. 550 simply requires that for jobs to be filled by local recruitment, there can be no discrimination in the wage rate between citizens and non-citizens of the United States.

It is uncontradicted in the record that from 1956 on, any locally recruited applicant who was a U.S. citizen would get only the local rate of pay. Although it is clear that the vast majority of firefighters hired locally were black Panamanians, the testimony of plaintiff Caton at trial established that some U.S. citizens were hired at the local rate of pay during or after 1956. There is simply no evidence of any policy or practice in the Fire Division against hiring white persons or U.S. citizens from 1956 to the present. There are no barriers of race, color, creed, national origin or citizenship to employment as a firefighter.

To demonstrate discrimination in violation of Title VII, the plaintiffs must show that Panamanian, non-U.S. citizens in a particular job are paid a lower basic wage than U.S. citizens in the same job.[18] This is

---

17. 2 C.Z.C. § 150:

Whenever the rate of basic compensation of an employee established prior to . . . this Act . . . is converted . . . to a rate of basic compensation established in relation to rates in areas other than the continental United States . . . such employees shall . . . continue to receive a rate of basic compensation not less than the rate of basic compensation to which he was entitled immediately prior to such conversion so long as he remains in the same position or in a position of equal or higher grade.

In the committee hearings this was a matter of great concern, because United States citizens had moved family and fortune to the Canal Zone and would, absent a "grandfathering", have to give up their job or acquiesce in wages substandard to the continental United States. The higher pay received by the United States citizens who remained as firefighters after 1956 was thus necessary in fairness to those employ-

ees. Notably, however, these higher-paid employees were not given increases in pay, but were merely "grandfathered" into the firefighter ranks without suffering any reduction in pay.

"Grandfathering" or "freezing" of pay rates of incumbents that otherwise would be adversely affected by new wage plans is a customary wage practice that appears both in private industry and governmental agencies when necessary to preserve the morale of innocent employees who are victims of lowering wage scales. It should be noted that by 1964 only three of these "grandfathered" U.S. citizens remained as firefighters, and by 1968, all 26 of the original "grandfathered" U.S. citizens had been either retired from the ranks or promoted out of nonsupervisory firefighter positions.

18. To eliminate all doubts, we expand this statement to cover discrimination of any kind in hiring wages, and all other employment ben-

not demonstrated by the evidence. At most, they simply allege the uncontradicted fact that the pay for their jobs as firefighters is lower than that paid to employees performing similar work in the United States (specifically the District of Columbia), and that the salaries paid to Canal Zone firefighters are often lower than the salaries paid to employees performing other civil functions in the Canal Zone Government, for example, policemen or teachers. On the basis of these facts and findings, no cause of action exists under Title VII, nor can it be claimed that the 1955 Treaty, including the Memorandum (P.L. 550, 2 C.Z.C. § 141 *et seq.*) has either been violated by the Canal Zone Government or can form the 1958–1971 basis for a discrimination claim.

Congress determined that the wage rates of non-supervisory firefighters could be tied to prescribed local rates for the legislatively confirmed reason that there was no need to recruit U.S. citizens for those positions that could be filled by local recruitment.[19] Although market supply, demand and availability here has been directly affected (or even circumscribed) by Congress, what the Court said in *Christensen v. Iowa*, 563 F.2d 353, 356 (8th Cir. 1977), has some relevance:

> We find nothing in the text and history of Title VII suggesting that Congress intended to abrogate the laws of supply and demand or other economic principles that determine wage rates for various kinds of work. We do not interpret Title VII as requiring an employer to ignore the market in setting wage rates for genuinely different work classifications.

This Court finds that all firefighters *hired* after 1956, recruited wherever or however, were and are paid the same wage rate.

The plaintiffs try to make something out of the fact that the vast majority of these firefighters are black Panamanians. From this they try to argue a sort of implied discrimination by numbers alone, that is, that black Panamanians were given jobs with lower pay while white persons or U.S. citizens received higher pay. But the fact is that all were eligible for employment as firefighters, whether black or white Panamanian, black or white U.S. citizen, or other citizenship, color or nationality, and if hired after 1956 all would have received the same pay as any of the black Panamanians hired in that period.

### One More Hurdle

As though this were not enough, the Government argues that a claim of discrimination on the basis of citizenship or alienage is not cognizable under Title VII, and simply constitutes no violation of Title VII. *Espinoza v. Farah Manufacturing Co.*, 414 U.S. 86, 95, 94 S.Ct. 334, 339, 38 L.Ed.2d 287, 295 (1973). More concretely, the government urges that even though it would be illegal to discriminate against aliens on the basis of race or national origin, it is not a violation of Title VII to pay all Panamanian *citizens* a basic wage different from that of U.S. *citizens*. Although this line of reasoning is persuasive and has obvious support, this Court continues to proceed in its analysis in a light most favorable to the plaintiffs and therefore construes their Title VII action as a claim of discrimination based upon national origin and race.

### Postscript

In concluding that the plaintiffs have established no discrimination inherent in the

---

efits, based on race, color, creed, national origin or citizenship.

**19.** Mr. Holland, in the Treaty hearings, *supra*, at 182, stated that

> as the Panamanians become more qualified ... the area of recruitment for more jobs becomes Panama, and the wage that is paid is the wage that prevails in that area of recruitment; ... for a long time the trend has been ... to assign to more and more

jobs, the wage rate that prevails in the Panama recruitment area, and not the wage rate that prevails far away in the United States.

I submit to you that this is wholesome, that it is economical ... and that it would be unrealistic for us to assign to a job a wage rate which that job would command in the United States when we know that it and all like it are going to be filled by persons recruited in Panama.

wage rate system from 1956 to the present among nonsupervisory firefighters, this Court nevertheless recognizes the interpretative problems introduced by P.L. 550. Clearly, this statute was intended to set forth policies to prevent discrimination in employment between U.S. citizens and Panamanians. Rates of compensation were required to be applied uniformly, irrespective of citizenship. *See* codification of P.L. 550 at 2 C.Z.C. § 145. The plaintiffs point to the undisputed fact that certain U.S. citizens who were firefighters before 1956 were paid higher salaries in the years immediately following 1956. This has been explained above as justifiable and not in violation of Title VII. Moreover, the undisputed fact that the vast majority of nonsupervisory firefighters were black Panamanians is not, in itself, evidence of discrimination by the Fire Division. As noted above, the sociological fact that many black Panamanians speak excellent English helps to explain this phenomenon.

## II.

### *Security Positions and Promotion in the Fire Division*

This brings us to the plaintiffs' claim that the designation of certain positions as "security positions", which the statute (2 C.Z.C. § 147) requires be filled by U.S. citizens only, operated as a discriminatory device to keep Panamanians and other non-U.S. citizens from being promoted to higher-paying jobs in the Fire Division. It is critical to recognize that the 1955 Treaty and Memorandum attached to the Treaty authorized the United States to designate certain posi-

tions as "security positions," to be filled by U.S. citizens only. Section 8, P.L. 550, 72 Stat. 406, 408, codified at 2 C.Z.C. § 147, states that the head of each department in the Canal Zone Government may designate a position that, for security reasons, must be filled by U.S. citizens.[20] Unlike the traditional, contemporary understanding of "security" that connotes protection of secrets, military or political, the 1954–56 use of the term had far different meanings. One of the three definitions prescribed employment of U.S. citizens where the position requires the use of U.S. citizens to insure continuity and capability of operation and administration of activities in the Canal Zone.[21] As time passed the existence and number of these "security" positions led to the establishment of an administrative committee. Security positions were annually reviewed by the committee and the committee's findings and recommendations were forwarded to the Governor of the Canal Zone who was authorized to designate the positions as security positions. Showing the government's sensitivity to the problem, through the years there was a marked decrease in the number and classification of security positions.[22]

Since determination of numbers and positions classed as "security" was made by administrative policy decision, not on the basis of an individual employee, the question is whether the correctness of the decision is subject to any judicial review. The government points out that the only mechanism for judicial review is the Administrative Procedure Act, 5 U.S.C. §§ 551–559, 701–706 *et seq.* The government submits that the provisions of this Act do not apply

20. *§ 147 Security Positions*

Notwithstanding any other provision of this subchapter but subject to the regulations referred to in section 155(a) of this title, the head of each department may designate any position under his jurisdiction as a position which for security reasons shall be filled by a citizen of the United States; including but not limited to, positions (a) involving security of property; (b) involving access to defense information not releasable to foreign nationals; or (c) requiring the use of United States citizens to insure continuity and capability of operation and administration of activities in

the Canal Zone by the United States Government.

21. Witnesses before the Senate Committee described the problem in supposed scenarios. One scenario talked in terms of riots or civil strife keeping 500–700 Panamanians from reporting for duty, to fill out a complement of 1,000 essential workers.

22. In February, 1919, there were 2,236 security positions, and this number steadily decreased until in July of 1976 there were only 580. See Government's Exhibit No. 1 at "Exhibit 11."

to the actions of the Governor of the Canal Zone. Territories are excluded from the category of "agency" because of the greater complexity of a territorial government's work and the degree to which it must deal with military and foreign policy considerations. *See* 5 U.S.C. §§ 551(1)(C), 701(b)(1)(C); *People of Saipan v. U. S. Department of Interior*, 356 F.Supp. 645 (D.Hawaii 1973). Judge Gesell expressly so ruled in *Panama Canal Pilots Association v. Calloway*, No. 1930–73 (D.D.C., May 10, 1974).

■ This Court concludes that the determination of "security positions" is the exclusive function of the United States, as provided in the Treaty Memorandum, P.L. 550, 2 C.Z.C. § 141 *et seq*. As the testimony and exhibits at trial suggest, the United States had a heavy responsibility in operating and maintaining the Canal situated in an area surrounded by a foreign nation. The Panama Canal, as a United States activity, required a certain minimum number of U.S. citizens, that number to be committed to the discretion of the Governor, who could operate the Canal in the event of civil strife or any other circumstance that might possibly affect the loyalties of Panamanian employees or their ability to get to work.

■ This Court is persuaded, as was the Court in *Panama Canal Pilots, supra,* that such decisions of the Canal Zone Government are exempt from the notice and review provisions of the Administrative Procedure Act. But if, on review, we are held to be in error, then this Court determines that on this record the APA was substantially complied with and the administrative decisions made by the Governor or his subordinates were and are not arbitrary, capricious or otherwise faulty.

### Promotion Data

As the number of security positions were, from time to time, reduced, some of the supervisory positions were opened up to non-U.S. citizens in recent years. The plaintiffs argue that it was discriminatory to keep those positions restricted to U.S. citizens in the years from 1956 on. The personnel records entered into evidence by the Government revealed that in the early 1960's, the ranks of Sergeant, Lieutenant, and Captain were opened to non-U.S. citizens. By 1976, in the Sergeant ranks, there were seven security positions and 19 non-security positions. These 19 non-security positions were filled with Panamanian citizens, three of whom were white and 16 black. One black Panamanian was promoted to the rank of Captain in 1976. The only other captain in 1976 was a white U.S. citizen. As of 1976, 12 of the black firefighters hired in 1956 had been promoted to the rank of Fire Sergeant. Three of these Sergeants were promoted as early as May 11, 1965. Until that date, all of the Sergeant and officer (Lieutenant and Captain) positions were considered "security" positions for the reasons outlined above.

### Promotion of Black U.S. Citizens

The plaintiffs assert a separate claim on behalf of six black U.S. citizens, alleging discrimination on the basis of race. Because of their U.S. citizenship, these six black firefighters were qualified to apply for security positions, namely, the rank of Fire Sergeant. All six black firefighters were allegedly hired in 1956 as Panamanian citizens, but have since become U.S. citizens.[23]

The discrimination complaint of these six black U.S. citizens is clearly separable from plaintiffs' claims of discrimination in promotion on the basis of "security positions" and plaintiffs' wage rate complaints. Notably, less attention was paid at trial to the unique complaint of these six black U.S. citizens. The evidence at trial indicated that one of the black U.S. citizens, George V. Jordan, filed a discrimination complaint with the Canal Zone Equal Employment Opportunity Officer in October of 1972.

---

**23.** The names of these six black U.S. citizens are as follows: A. Wilmont, P. Gilkes, C. Jordan, G. Jordan, A. Morris, and H. Clarke. By 1976, Wilmont was promoted to Sergeant, and Morris to Captain.

Specifically, Jordan complained that his nonselection for promotion to Fire Sergeant resulted from discriminatory procedures based upon race, color and national origin, and that an unfair preference was given to whites in promotion decisions. Following an investigation, a final decision was made by the Panama Canal Zone Government on January 19, 1973, concluding that there was no valid evidence of discrimination based on color or national origin. Mr. Jordan was permitted to appeal that decision to the Civil Service Commission, which also decided that no valid evidence of discrimination existed. The Board's decision was published on July 17, 1973, allowing Mr. Jordan 30 days to appeal the decision in a U.S. District Court. No record of an appeal to a District Court is to be found in the plaintiffs' evidence.

■ Even assuming that all six of the black U.S. citizens' complaints regarding promotion were included in this EEO action and appeal to the Civil Service Commission, we find that the thirty-day statute of limitation bars this portion of the plaintiffs' action. 42 U.S.C. § 2000e–16(c).

As U.S. citizens, Mr. Jordan and the other five black firefighters could have appealed the Civil Service Commission decision by filing a suit in a District Court either in the Canal Zone or in the United States. Their failure to file an appeal precludes this Court's review of the final administrative findings of no discrimination on the basis of race or national origin in its promotion system.

■ Even if this Court is mistaken as to the running of the statute of limitation against the claim of these six black U.S. citizens, they have failed to establish discrimination in the promotion system of the Canal Zone Fire Division. The investigation report submitted to the Director of the EEO office in the Canal Zone evidences the careful attention given to the complaint regarding promotion to Sergeant of black U.S. citizens. On appeal to the Board of Appeals and Review of the Civil Service Commission, it was decided that no valid evidence of discrimination existed in the promotion system. This Court finds evidence supporting the Board's conclusion and finds no error has been established in the Board's investigations or conclusions. Thus, assuming that this Court must reach the merits of this particular claim, no discrimination has been found.

*Primary and Alternative Holdings*

The specific holdings of this Court in reaching a decision in the Government's favor may be set forth as follows:

(1) The plaintiffs' contract claim for back-pay for the period from July 1, 1956, until July 25, 1958, is barred by the six-year statute of limitations in 28 U.S.C. § 2501. *See also* 28 U.S.C. § 2401.

(2) Assuming *arguendo* that the statute of limitations can be overcome on the basis that the plaintiffs' claim is ongoing while administrative remedies are being exhausted, we find that the District Court for the Canal Zone is not one of the District Courts where a Tucker Act claim may be properly brought. This conclusion renders moot the problematic fact that most, if not all, of the plaintiffs' claims exceed the $10,000 limit on such claims in District Courts. 28 U.S.C. § 1346(a)(2).

(3) Assuming *arguendo* that the plaintiffs' claim for back-pay from July 25, 1958, to the present may be heard by this Court, we find no wage violation by the Canal Zone Government, because all nonsupervisory firefighters, without respect to race, national origin, or citizenship (with the exception of "grandfathered" U.S. citizens who were paid U.S. wage rates until they were all retired or promoted by 1968), were paid the same local wage rate.

(4) Because § 717 of Title VII, 42 U.S.C. § 2000e–16, made applicable to governmental employees by the 1972 amendments, provides the exclusive remedy for the plaintiffs' claims, we find that Title VII as well as the doctrine of sovereign immunity preempts the plaintiffs' claims that were based on 28 U.S.C. §§ 1331, 1343, & 2201; 42 U.S.C. §§ 1981, 1983; the Fifth and Fourteenth Amendments to the U.S. Con-

stitution, and the 1955 Treaty and attached Memorandum.

(5) Because the plaintiffs' allegations of discrimination were presented in the form of a "third party complaint," there is no right of judicial review of the administrative action taken in this suit.

(6) Assuming *arguendo* that the "third party complaint" was adequate to constitute a complaint on behalf of each individual, we find that the plaintiffs failed to file the present action within 30 days of receipt by the third party of notice of final agency action.

(7) Assuming *arguendo* that notice of final administrative action was never given to the complainants to trigger the 30-day statute of limitations, this Court *arguendo* finds that the suit is properly brought because, when filed in 1977, it was premature, and because the names of all the parties are now known, the suit became timely and this Court may reach the merits of the complaint.

(8) Assuming *arguendo* that the plaintiffs' suit is ripe for adjudication on the merits, this Court finds no discrimination in the wage rate system in operation in the Canal Zone Fire Division from 1972 to the present.

(9) This Court likewise finds no merit in the non-U.S. citizens' claim that, by virtue of the "security positions," they were discriminated against in an unlawful and therefore unfair promotion system. This claim represents an attack on administrative decisions by the Canal Zone Government, and is not subject to judicial review under the terms of the Administrative Procedure Act.

(10) Assuming *arguendo* that the administrative decisions of the Canal Zone Government are reviewable by this Court, this Court finds that the ever-reduced number of "security positions" were necessary and justifiable in the Canal Zone, and cannot be characterized as discriminatory tools against members of a particular race, citizenship, or national origin. Consequently, we do not find that the decisions made by the Governor or his subordinates were arbitrary, capricious or otherwise faulty.

(11) This Court finds the discrimination in promotion claim of Mr. George Jordan, a black U.S. citizen, to be barred by the 30-day statute of limitations, because of his failure to pursue an appeal to the District Court after final administrative action was taken.

(12) Assuming *arguendo* that George Jordan's discrimination claim was made on behalf of all six of the black U.S. citizens now bringing this claim, this Court finds their claims likewise to be barred by the 30-day statute of limitations.

(13) Assuming *arguendo* that the specific claims of the six black U.S. citizens overcome the 30-day statute of limitations because their claim is merged with the claims of the class as a whole, this Court finds no unlawful discrimination in the promotion system with regard to black U.S. citizens, or black non-U.S. citizens.

(14) Finally, because of the above conclusions, this Court finds it unnecessary to reach the issue of monetary damages.

### Summary of Findings [24]

Considering the claims presented by the plaintiffs in a light most favorable to them,

24. In making its findings and conclusions, this Court considered plaintiffs' 56 exhibits and defendant's 21 exhibits. The authenticity of each of these exhibits was not challenged, with one exception (Government's Exhibit No. 16) where plaintiffs' counsel objected to an exhibit as unsigned and unidentified. This exhibit is a handy description of employment practices and as such does not supply factual information not otherwise available. Nevertheless, in view of the objection it is excluded and has not been considered. The only other objections asserted as to some documents by the Government was irrelevancy, and those objections are likewise overruled. In addition, on March 23, 1981, plaintiffs proffered three new exhibits with their Supplemental Brief, consisting of (i) Executive Order 11246 (Sept. 24, 1965, Nondiscrimination in Government Employment); (ii) Letter from International Association of Fire Fighters to the GAO (Sept. 15, 1972); and (iii) Letter from the GAO regarding Canal Zone firefighter wages. These exhibits have also been received into evidence. The Court's own two exhibits consist of indexes of the plaintiffs' and Government's exhibits.

this Court fails to find any discrimination on the basis of national origin or race with regard to the hiring, promotion, and wage scales of the Canal Zone firefighters since 1956. This Court is of the opinion that the plaintiffs' complaint grew out of misunderstandings that were recognized and addressed in the 1955 Treaty and Memorandum. Neither the classification of the position opened up in 1956 for nonsupervisory firefighters, nor the ever shrinking restriction of supervisory positions to U.S. citizens for security reasons, reveals any discrimination against black persons or Panamanian citizens or both. It is at most unfortunate that the political and sociological factors present in the Canal Zone over the past 25 years created in the eyes of the plaintiffs the appearance of discrimination against black Panamanians. That illusion, however, will not form the basis of a Title VII lawsuit. On the facts, the Canal Zone Government stayed within Congressional guidelines, and this Court does not find discrimination in the Canal Zone Government's establishment of wage scales and promotion opportunities. A U.S. citizen, either white or black, who was hired in late 1956 would be paid the local wage rate paid to Panamanians. A Panamanian, either white or black, would not be eligible for a "security position" so designated in light of the needs of the United States in the Canal Zone. Once a supervisory position was classified as a non-security position, then any person, black or white Panamanian, or black or white U.S. citizen, would be eligible to apply for such a position. Neither the class of plaintiffs before this Court as a whole, nor any of the subclasses before this Court, have established discrimination in violation of Title VII. This opinion constitutes our findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52. Judgment will issue for the defendants.