Vicente J. ANDERSON,
et al., Appellants,

v.

Alberto Aleman ZUBIETA, Appellee.

No. 97–5247.

United States Court of Appeals,
District of Columbia Circuit.

Argued Sept. 3, 1998.

Decided July 2, 1999.

Richard J. Hirn argued the cause for appellants. With him on the briefs was Ernest Allen Cohen.

Kimberly N. Brown, Assistant U.S. Attorney, argued the cause for appellee. With her on the brief were Wilma A. Lewis, U.S. Attorney, and R. Craig Lawrence, Assistant U.S. Attorney.

Before: SENTELLE, HENDERSON and GARLAND, Circuit Judges.

Opinion for the Court filed by Circuit Judge GARLAND.

GARLAND, Circuit Judge:

Plaintiffs are black American citizens of Panamanian or Hispanic national origin who have long worked for the Panama Canal Commission and its predecessor, the Panama Canal Company (together, the "PCC" or "Canal Commission"). The PCC pays them substantially less in salary and benefits than it pays other American citizens working at the same jobs—the overwhelming majority of whom are white, non-Panamanians. The plaintiffs allege this pay differential constitutes race and national origin discrimination in violation of Title VII of the Civil Rights Act of 1964, Pub.L. No. 88–352, 78 Stat. 241 (codified as amended at 42 U.S.C. §§ 2000e to 2000e–17 (1994)). The district court granted summary judgment in favor of the PCC and dismissed plaintiffs' complaint. We reverse.

## I

The Canal Commission is a wholly-owned United States government corporation. The thirteen plaintiffs were hired by the PCC before 1979, and all but two before 1976. Compl. ¶¶ 4–16. One has since retired. *Id.* All the plaintiffs are currently United States citizens: eleven were naturalized between 1987 and 1994; one became a citizen in 1977 following his service in the military; and the remaining plaintiff is the son of a United States citizen whose citizenship was not registered with the U.S. Embassy until 1991. *Id.* The PCC denies plaintiffs three types of benefits that it grants to other employees, which generates the pay differential of which they complain.

The first benefit is the so-called "tropical differential," the current version of which was authorized by Congress in the Panama Canal Act of 1979, 22 U.S.C. § 3657. The differential, paid as a "recruitment or retention" incentive, is a 15% increment above the employee's basic pay. *Id.* § 3657(a); *see* 35 C.F.R. § 251.31(a). Under the statute it is available to "any" employee who meets the eligibility requirements, without reference to the nature of the employee's job. Any-

one employed before October 1, 1979[1] is statutorily eligible for the benefit, regardless of citizenship or place of recruitment, as is anyone recruited after that date from outside Panama. 22 U.S.C. § 3657(a). Because all plaintiffs were employed before October 1, 1979, all are eligible under the statutory criteria.

The Canal Commission, however, has chosen to restrict eligibility further than Congress required. Under the PCC's regulations, only American citizens are eligible for the tropical differential. 35 C.F.R. § 251.31(a). Moreover, employees hired from within Panama ("Panamanian hires") are eligible only if they also come within a "grandfather clause" the PCC adopted in 1976—which requires that they were employed and receiving the differential no later than July 3, 1976. *See id.* § 251.31(c). This effectively limits the eligibility of Panamanian hires to those who already were American citizens on that date.[2] This requirement disqualifies all of the plaintiffs.

The second benefit is known as the "equity adjustment package," and consists of free rent and electricity in PCC housing, as well as certain travel and educational benefits. Pls. Br. at 15. For many years, the PCC operated subsidized stores where employees who were American citizens could purchase goods at prices below those available elsewhere in Panama. *See* PCC Cross–Motion (Dist. Ct. Record Entry [hereinafter "R."] 13), Ex. 37. As part of the Panama Canal Treaty of 1977, the United States agreed to close those stores. PCC citizen-employees, however, were permitted to shop in military commissaries for a limited period of time ending September 30, 1984. Effective October 1, 1984, Congress authorized an allowance for any U.S. citizen (as of the time the benefits are received) who was employed on September 30, 1979, regardless of place of recruitment. The allowance was also authorized for anyone recruited after September 30, 1979 from outside Panama, regardless of citizenship. 22 U.S.C. § 3646. From 1984–89, five plaintiffs were eligible under these statutory criteria and received the equity package benefits.

On December 29, 1989, the last American administrator of the Canal changed the PCC's policy and imposed additional eligibility requirements on Panamanian hires. Under these new criteria, an employee hired from within Panama is eligible for the equity package only if he or she was employed on September 30, 1979 *and* was a citizen before October 1, 1984. *See* PCC Cross–Motion (R. 13), Exs. 20, 54. As a consequence of the new criteria, four plaintiffs who had been receiving the equity package lost their benefits. Pls. Br. at 16; PCC Br. at 8.

The final benefits at issue are travel and home leave vacation benefits. An employee hired from within Panama is eligible if he or she was employed on September 30, 1979 and was a citizen as of that date. An employee recruited from outside of Panama is eligible regardless of date of employment or citizenship. PCC Cross–Motion (R. 13), Ex. 67. The date-of-citizenship requirement disqualifies all but one of the plaintiffs. Compl. ¶¶ 4–16.[3]

---

1. The Panama Canal Treaty of 1977 took effect on this date.

2. Prior to the Canal Act, the Canal Commission was authorized to pay the tropical differential to all U.S. citizens, but only to U.S. citizens. *See* Pub.L. No. 85–550, § 7, 72 Stat. 405, 407–08 (1958). In 1976, the PCC by regulation limited payment to those who were recruited from outside of Panama, but grandfathered in those locally-hired citizen-employees who had been working since July 3, 1976 and receiving the differential (and hence who had been citizens) as of that date. PCC Br. at 5. The Commission chose to retain those limitations after the Canal Act was passed in 1979. *See* 35 C.F.R. § 251.31(b)(1)(i); *id.* § 251.31(c)(1); *see also* PCC Br. at 6.

3. As is evident from the description of the three benefit programs, and as the PCC conceded at oral argument, plaintiffs are not disqualified by statute from receiving the benefits at issue in this case. Only the PCC's discretionary policies render them ineligible.

Between June 2, 1995 and July 3, 1996, the plaintiffs filed formal complaints with the PCC's Office of Equal Opportunity alleging that their exclusion from these salary and benefit programs constituted race and national origin discrimination. Pls. Br. at 3. The PCC accepted most of the claims for investigation.[4] After completing the investigation, however, it dismissed the claims as untimely, ruling that plaintiffs should have filed years earlier when the benefit policies were first applied to them.

In December 1996, the plaintiffs brought an action in district court, alleging that the denial of the three benefit packages constituted intentional disparate treatment, and had an unlawful disparate impact, in violation of 42 U.S.C. § 2000e–2.[5] Plaintiffs relied on statistical evidence, as well as on an attack on the rationales offered by the PCC for denying them the benefits. They contended that the date-of-citizenship requirements were mere pretext, guaranteeing continued benefits to white non-Panamanians while denying them to black Panamanian employees, the vast majority of whom did not become citizens until after the cut-off dates.[6] They also proffered evidence of what they contended was the Panama Canal's "longstanding history of discriminating against employees from the West Indies in every aspect of Canal life and employment," symbolized, they said, by a racially-based payroll system in which white Canal workers were paid in gold from a "gold roll," while black Panamanians were paid in less-valuable Panamanian silver. Pls. Br. at 21. "[P]ayment of the tropical differential to some employees and not others," they contended, reflected nothing more than "a continuation of the 'gold' and 'silver' roll wage differentials which were based on race." Id. at 35.

The district court granted summary judgment in favor of the Commission and dismissed the case. The court rejected plaintiffs' disparate treatment claim, concluding they were denied benefits because of their "citizenship, not because of membership in a Title VII protected class." Anderson v. Zubieta, 977 F.Supp. 439, 441–42 (D.D.C.1997). The court denied the disparate impact claim on the ground that, although disparate impact "may be true as a matter of fact," there was "no evidence that the Defendant acted with any unlawful discriminatory purpose." Id. at 442. This appeal followed.

## II

As an initial matter, we must decide whether plaintiffs timely filed their claims with the PCC's Office of Equal Opportunity. Regulations issued by the Equal Employment Opportunity Commission (EEOC) require federal employees to bring Title VII complaints to the attention of an Equal Employment Opportunity counselor within 45 calendar days of the alleged discriminatory event. See 29 C.F.R. § 1614.105(a)(1). A plaintiff's administrative complaint is untimely unless it is brought within the 45–day limitations

---

4. The PCC declined to accept the complaints of two plaintiffs regarding the equity package, on the ground that those plaintiffs had already filed formal grievances. See 5 U.S.C. § 7121(d) (barring federal employees from raising discrimination charges through both negotiated grievance and administrative complaint procedures). The district court did not consider this issue, and because it appears to involve factfinding we leave it for that court's initial consideration on remand.

5. The plaintiffs also alleged a violation of the Fifth Amendment, an argument not pressed on this appeal.

6. In conjunction with the Panama Canal Treaty of 1977, Congress amended U.S. immigration laws to make it easier for noncitizen employees of the PCC to become U.S. citizens. The amendments made Panamanian-born Canal employees residing in the Canal Zone, as well as their spouses and children, eligible for "special immigrant" status, which in turn made them permanent residents and eligible for naturalization. See 8 U.S.C. § 1101(a)(27)(E)-(G). Eleven of the plaintiffs became U.S. citizens pursuant to this legislation. Pls. Br. at 10.

period, or unless the plaintiff establishes a basis for equitable tolling. *See id.* § 1614.107(b).

After investigating plaintiffs' complaints, the PCC rejected them as untimely. The Canal Commission had amended the benefit policies in question in 1976, 1979, and 1989. The plaintiffs, all of whom became citizens between 1977 and 1994, received notice that they were not entitled to the benefits on various dates ranging from July 13, 1977 to July 7, 1994. *See* PCC Stmt. of Material Facts (R. 16). None brought a complaint within 45 days of either the amendments or the notice; the first complaint was not brought until June 2, 1995. On that basis, the PCC concluded plaintiffs' administrative complaints were filed too late.

The plaintiffs respond that their complaints allege continuing violations of Title VII, actionable upon receipt of each paycheck. We agree. As a unanimous Supreme Court said in *Bazemore v. Friday,* "[e]ach week's paycheck that delivers less to a black than to a similarly situated white is a wrong actionable under Title VII, regardless of the fact that this pattern was begun prior" to the limitations period. 478 U.S. 385, 395, 106 S.Ct. 3000, 92 L.Ed.2d 315 (1986) (Brennan, J., concurring, joined by all other Members of the Court). The Courts of Appeals have repeatedly reached the same conclusion.[7]

The Canal Commission bases its contrary position on a line of Supreme Court cases beginning with *United Air Lines v. Evans,* 431 U.S. 553, 97 S.Ct. 1885, 52 L.Ed.2d 571 (1977). In *Evans,* defendant had discriminatorily dismissed the plaintiff in 1968, pursuant to a policy barring married female flight attendants. When it rehired plaintiff in 1972 after changing the policy, it did not give her any seniority credit for her earlier service. Suing in 1973, plaintiff conceded that a claim for her 1968 dismissal was untimely, but contended that the seniority system impermissibly gave present effect to that past act of discrimination. The Court held the challenge to defendant's neutral seniority system time barred notwithstanding that present effect. *Id.* at 558, 97 S.Ct. 1885.

The second case in the *Evans* line, *Delaware State College v. Ricks,* 449 U.S. 250, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), involved a professor's claim of unlawful termination by a university. The Court held that the limitations period was triggered at the moment the university allegedly denied plaintiff tenure for a discriminatory reason, rather than a year later when he ultimately lost his job. In the third case, *Lorance v. AT&T Technologies, Inc.,* 490 U.S. 900, 903, 109 S.Ct. 2261, 104 L.Ed.2d 961 (1989), the Court held that when a seniority system was "not alleged to be discriminatory on its face or as presently applied," a complaint contending it was originally adopted for discriminatory reasons (outside the limitations period) was time barred.

---

7. *See Ashley v. Boyle's Famous Corned Beef Co.,* 66 F.3d 164, 167–68 (8th Cir.1995) (en banc); *Brinkley-Obu v. Hughes Training, Inc.,* 36 F.3d 336, 345–49 (4th Cir.1994) ("Our cases demonstrate ... that in a compensation discrimination case, the issuance of each diminished paycheck constitutes a discriminatory act."); *Beavers v. American Cast Iron Pipe Co.,* 975 F.2d 792, 796–800 (11th Cir.1992); *EEOC v. Penton Indus. Publ'g Co.,* 851 F.2d 835, 838 (6th Cir.1988) (recognizing that "where an employer continues to presently impose disparate work assignment or pay rates between similarly situated employee groups" a continuing violation exists); *Gibbs v. Pierce County Law Enforcement Support Agency,* 785 F.2d 1396, 1399 (9th Cir.1986) ("The policy of paying lower wages ... on each payday constitutes a 'continuing violation.'") (internal quotation omitted); *see also Miller v. Beneficial Management Corp.,* 977 F.2d 834, 843–44 (3d Cir.1992) (applying continuing violations doctrine to unequal pay claim under Equal Pay Act); *Satz v. ITT Fin. Corp.,* 619 F.2d 738, 743 (8th Cir.1980) ("The practice of paying discriminatorily unequal pay occurs not only when an employer sets pay levels, but as long as the discriminatory differential continues."). *But cf. Hendrix v. City of Yazoo,* 911 F.2d 1102, 1103–05 (5th Cir.1990) (holding that discriminatory pay reduction under Fair Labor Standards Act does not constitute continuing violation).

The *Evans–Ricks–Lorance* line of cases does not support the Canal Commission's contention that plaintiffs' claims are time barred. To the contrary, the *Lorance* Court's explanation of the difference between that line and *Bazemore* makes it clear that the opposite is true. As *Lorance* explained, *Bazemore* was a case in which plaintiffs contended not just that the pay system was originally adopted for discriminatory reasons, but that it continued to discriminate unlawfully each time it was applied. *Lorance,* 490 U.S. at 912 n. 5, 109 S.Ct. 2261. "There is no doubt," Justice Scalia said, that a system "that treats similarly situated employees differently . . . can be challenged at any time." *Id.* at 912, 109 S.Ct. 2261. By contrast, in *Lorance,* "[p]etitioners [did] not allege that the seniority system treat[ed] similarly situated employees differently or that it ha[d] been operated in an intentionally discriminatory manner. Rather, they claim[ed] that its differential impact on the sexes [was] unlawful because the system 'ha[d] its genesis in [sex] discrimination.'" *Id.* at 905, 109 S.Ct. 2261.[8]

Similarly, *Lorance* explained that in *Evans* the plaintiff did not contend that the present seniority system was discriminatory, but rather "asserted a claim that [was] wholly dependent on discriminatory conduct occurring well outside the period of limitations"—that is, her dismissal in 1968. *Lorance,* 490 U.S. at 907–08, 109 S.Ct. 2261; *see Evans,* 431 U.S. at 560, 97 S.Ct. 1885 ("[R]espondent does not attack the bona fides of United's seniority system, and . . . makes no charge that the system is intentionally designed to discriminate. . . ."). Likewise in *Ricks,* the *Lorance* Court said, plaintiff "did not claim that 'the manner in which his employment was terminated differed discriminatorily from the manner in which the College terminated other professors who had been denied tenure.'" Rather, the only alleged discrimination occurred earlier, when plaintiff had been demoted into the ranks of the untenured. *See Lorance,* 490 U.S. at 906, 109 S.Ct. 2261 (quoting *Ricks,* 449 U.S. at 258, 101 S.Ct. 498).

The plaintiffs here fall on the *Bazemore* rather than *Evans* side of the line drawn in *Lorance.* They do not seek relief for the PCC's initial announcement of its discriminatory policies, but rather for their continued application. Unlike the petitioners in *Lorance,* the plaintiffs in this case allege that the PCC's policy currently "treats similarly situated employees differently." *Id.* at 905, 109 S.Ct. 2261. Accordingly, under *Lorance* they may challenge those policies "at any time." *Id.* at 912, 109 S.Ct. 2261.

Defendant also seeks support in a series of our cases holding that, to establish a continuing violation, a plaintiff must show "a series of related acts, one or more of which falls within the limitations period, or the maintenance of a discriminatory system both before and during the [statutory] period." *McKenzie v. Sawyer,* 684 F.2d

---

8. The result in *Lorance* was also based in part on the fact that "[s]eniority systems . . . are afforded special treatment under Title VII." *Id.* at 904, 109 S.Ct. 2261 (quoting *Trans World Airlines v. Hardison,* 432 U.S. 63, 81, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977)). That special treatment, the Court said, was "by reason of § 703(h), which states:

Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer to apply different standards of compensation, or different terms, conditions, or privileges of employment pursuant to a bona fide seniority . . . system, . . . provided that such differences are not the result of an intention to discriminate because of race, color, religion, sex, or national origin. . . .

*Id.* at 904–05, 97 S.Ct. 2264 (quoting Title VII § 703(h), 42 U.S.C. § 2000e–2(h)). That section has no application to the benefits policies at issue here. *See also* 42 U.S.C. § 2000e–5(e)(2) (overruling *Lorance*'s application to seniority systems by providing that an intentionally discriminatory seniority system is a violation "when . . . adopted, when an individual becomes subject to the seniority system, or when a person aggrieved is injured by the application of the seniority system") (added by Civil Rights Act of 1991, Pub.L. No. 102–166, § 112, 105 Stat. 1075, 1078–79 (1991)).

62, 72 (D.C.Cir.1982) (quoting *Valentino v. United States Postal Serv.*, 674 F.2d 56, 65 (D.C.Cir.1982)); *see Palmer v. Kelly*, 17 F.3d 1490, 1496 (D.C.Cir.1994) (citing *Berger v. Iron Workers Reinforced Rodmen Local 201*, 843 F.2d 1395, 1422 (D.C.Cir. 1988)). Defendant's quotation of *McKenzie* is accurate, but the line of cases it represents goes to an analytically different question than the one we have just discussed. Thus far, we have been considering the "first question in the analysis of a continuing violations claim," namely, "whether an actual violation of Title VII occurred during the statutory period." *Palmer*, 17 F.3d at 1496. As noted above, plaintiffs have adequately alleged such a "present violation." *See id.* (quoting *Evans*, 431 U.S. at 558, 97 S.Ct. 1885). As explained below, that claim survives summary judgment. If plaintiffs' claim of a present violation is ultimately proven, it will justify their request to be made whole for those paychecks received during the 45–day window and for all paychecks issued thereafter.

■ Like most plaintiffs, however, the plaintiffs here want more than that. They also want to reach back and obtain compensation for the lower paychecks they received prior to the 45–day limitations period.[9] It is to this "next question" that our cases refer when they require that a

present violation be either "part of a series of related discriminatory acts or ' . . . caused by a discriminatory system in effect both before and during the limitations period." *Id.*[10]

■ Plaintiffs plainly satisfy this test as well. Indeed, they allege that their current lower paychecks and benefits are both part of a series of such discriminatory payments *and* caused by the continued maintenance of a broadly discriminatory pay and benefits system. Plaintiffs do not merely challenge "separate and distinct" events, *see Stoller v. Marsh*, 682 F.2d 971, 975 (D.C.Cir.1982), but rather allege that the "current violations" they have identified "were taken pursuant to the same employment policy as the actions sought to be challenged outside the normally applicable limitations period." *Berger*, 843 F.2d at 1422 (citing *Evans*, 431 U.S. at 558, 97 S.Ct. 1885). "Where, as here, discrimination is not limited to isolated incidents, but pervades a series or pattern of events which continue to within [45] days of the filing of the charge . . . , the filing is timely . . . regardless of when the first discriminatory incident occurred." *Laffey v. Northwest Airlines*, 567 F.2d 429, 473 (D.C.Cir.1976). We therefore reject the contention that plaintiffs' claims are time barred.[11]

---

**9.** They concede, however, that this claim is bounded by 42 U.S.C. § 2000e–5(g)(1), which limits back pay to two years prior to the filing of an administrative complaint. *See also* 29 C.F.R. § 1614.501(c)(1); *McKenzie*, 684 F.2d at 72 n. 8.

**10.** *See McKenzie*, 684 F.2d at 72 ("Plaintiffs charging a continuing violation of Title VII need not show that the entire violation occurred within the actionable period. . . . Once having shown discrimination continuing into the actionable period, however, the plaintiffs may also recover for portions of the persistent process of illegal discrimination that antedated the limitations period.") (citing *Laffey v. Northwest Airlines*, 567 F.2d 429, 472 (D.C.Cir.1976)); *see also Berger*, 843 F.2d at 1422 ("Plaintiffs hope to connect the violations which are clearly within the limitations period . . . to the violations we have held to be outside the limitations period.").

**11.** The Commission also seeks comfort in another line of cases which, it asserts, establishes that for a claim to fit within the continuing violations doctrine, the employee must "not at the time know or have reason to know that an employment decision was discriminatory in nature." *Stoller*, 682 F.2d at 974; *see Smith–Haynie v. District of Columbia*, 155 F.3d 575, 579–80 (D.C.Cir.1998). Because plaintiffs did know of the allegedly discriminatory nature of the PCC's pay policies prior to the limitations period, the PCC contends they are barred from asserting a continuing violation. But the portions of both *Stoller* and *Smith-Haynie* cited by the PCC do not discuss the continuing violations doctrine, which deems certain claims to be timely filed within the limitations period, but rather discuss the criteria for the equitable tolling doctrine, which permits the tolling of that period. Because plaintiffs satisfy the requirements of the continuing violations doc-

## III

We turn now to the merits of plaintiffs' claims. We review the district court's grant of defendant's motion for summary judgment de novo, and can sustain the court's decision only if "there is no genuine issue as to any material fact and ... the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); see FDIC v. Bender, 127 F.3d 58, 63 (D.C.Cir. 1997). We must view the evidence in the light most favorable to the non-moving party, and ask "whether any reasonable jury could find in its favor." Harbor Ins. Co. v. Schnabel Found. Co., 946 F.2d 930, 935 (D.C.Cir.1991).

In this Part, we first set forth the framework for analyzing plaintiffs' claims of unlawful wage discrimination under Title VII. We then focus on the first element of that framework, the prima facie case, and consider the reasons given by the district court, and an alternative rationale offered by the Canal Commission, for finding that plaintiffs failed to establish such a case. We conclude that both the district court and the Commission were wrong, and that plaintiffs have met the requirements for showing a prima facie violation of Title VII.

### A

■ Plaintiffs allege wage discrimination under theories of both disparate treatment and disparate impact. Disparate treatment occurs when "[t]he employer simply treats some people less favorably than others because of their race, color, religion, sex, or national origin." International Bhd. of Teamsters v. United States, 431 U.S. 324, 335 n. 15, 97 S.Ct. 1843, 52 L.Ed.2d 396 (1977). "Proof of discriminatory motive is critical" for such claims. Id. Disparate impact claims, on the other hand, "involve employment practices that are facially neutral in their treatment of different groups but that in fact fall more harshly on one group than another and

cannot be justified by business necessity." Id. at 336 n. 15, 97 S.Ct. 1843. "Proof of discriminatory motive ... is not required under a disparate-impact theory." Id.

■ The familiar three-step evidentiary framework for proving a disparate treatment case was set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). The plaintiffs must first establish a prima facie case, the elements of which vary according to the circumstances. Id. at 802 & n. 13, 93 S.Ct. 1817. For a prima facie case of wage discrimination, plaintiffs must show "membership in a protected class ... , and that [they] were performing work substantially equal to that of white employees who were compensated at higher rates than they were." Coward v. ADT Sec. Sys., Inc., 140 F.3d 271, 273 (D.C.Cir.1998) (internal quotations and alterations omitted); see id. at 275. Once plaintiffs establish a prima facie case of disparate treatment, under the second step of McDonnell Douglas "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the challenged employment practice. McDonnell Douglas, 411 U.S. at 802, 93 S.Ct. 1817. If the defendant carries this burden, the third step requires that plaintiffs be "afforded a fair opportunity to show that [the] stated reason ... was in fact pretext" for discrimination. Id. at 804, 93 S.Ct. 1817. For a disparate treatment case finally to reach the jury, the court must find in light of all the evidence that "the plaintiff has met his burden of showing that a reasonable jury could conclude that he had suffered [intentional] discrimination." Aka v. Washington Hosp. Ctr., 156 F.3d 1284, 1290 (D.C.Cir.1998) (en banc).

■ In a disparate impact case, a three-step, burden-shifting framework is also employed. As with disparate treatment, the plaintiff must first make out a prima facie case. Albemarle Paper Co. v. Moody, 422 U.S. 405, 425, 95 S.Ct. 2362, 45

trine, they have no need to rely on a theory of equitable tolling.

L.Ed.2d 280 (1975). This "may be established by policies or practices that are neutral on their face and in intent but that nonetheless discriminate in effect against a particular group." *International Bhd. of Teamsters,* 431 U.S. at 349, 97 S.Ct. 1843. In the second step, the burden shifts to the employer to "demonstrate that the challenged practice is job related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e–2(k)(1)(A)(i); *see Griggs v. Duke Power Co.,* 401 U.S. 424, 431, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).[12] Finally, if the defendant demonstrates business necessity, plaintiffs must be given an opportunity to demonstrate that an alternative employment practice could meet the employer's legitimate needs without a similar discriminatory effect. *See* 42 U.S.C. § 2000e–2(k)(1)(A)(ii); *Albemarle Paper Co.,* 422 U.S. at 425, 95 S.Ct. 2362.

**B**

■ Plaintiffs receive a 15% lower salary than their white, non-Panamanian counterparts and are not given the equity package and vacation benefits. This is sufficient to establish a prima facie case of wage discrimination. There is no dispute that race and national origin are protected classes. Nor is there any dispute that the work plaintiffs perform is substantially the same as that of the white non-Panamanians: the PCC awards the wage differential and benefits as an increment above an employee's base salary regardless of the kind of work he or she performs or the level of skill it requires.

In addition to this comparison of their personal situations, plaintiffs offered statistics showing a wide disparity between the percentages of black versus white U.S. citizens who receive the higher salary and benefits, as well as between the percentages of U.S. citizens of American versus Panamanian or Hispanic national origin who receive them. The statistics offered by plaintiffs were compiled by the PCC's own Office of Equal Opportunity from a survey it conducted of PCC employees, all of whom were U.S. citizens. The following table summarizes those statistics:

Percentage of U.S. Citizen Employees Receiving Indicated Benefit[13]

| | % of White | % of Black | % of American National Origin | % of Panamanian or Hispanic National Origin |
|---|---|---|---|---|
| Tropical Differential | 76% | 15% | 78% | 27% |
| Equity Package | 65% | 25% | 64% | 46% |
| Vacation Benefits | 96% | 58% | 97% | 70% |

According to plaintiffs' evidence, each of the disparities shown in the table exceeds 1.96 standard deviations under a two-tailed test of statistical significance. Pls. Br. at 19 (citing Hirn Decl. ¶¶ 3, 4 (R. 9)). Many of the disparities are far in excess of 1.96 standard deviations.[14] Under our case

---

**12.** For purposes of the disparate impact test, Title VII defines the term "demonstrates" as "meets the burdens of production and persuasion." 42 U.S.C. § 2000e(m). This definition was added by the Civil Rights Act of 1991, Pub.L. No. 102–166, § 104, 105 Stat. 1071, 1074 (1991). *Compare Thomas v. National Football League Players Ass'n,* 131 F.3d 198, 202 (D.C.Cir.1997) (characterizing defendant's burden at second stage of disparate treatment test as a " 'burden of production' because the ultimate burden of persuasion remains with the plaintiff").

**13.** *See* PCC Survey, summarized in Pls. Stmt. of Material Facts (R. 9) ¶¶ 25–26, 37–38, 42–43; PCC Cross–Motion (R. 13), Ex. 62–64.

**14.** For example, the disparity with respect to race was 4.24 standard deviations for the tropical differential, 2.8 standard deviations for the equity package, and 2.7 for the vacation benefits. The disparity with respect to national origin was 4.6 standard deviations for the tropical differential and 2.46 for the vacation benefits. *See* Hirn Decl. ¶¶ 3, 4 (R. 9).

law, this level of statistical significance is sufficient to establish a prima facie case of both disparate treatment and disparate impact. *See Berger,* 843 F.2d at 1412; *Palmer v. Shultz,* 815 F.2d 84, 91–92 (D.C.Cir. 1987); *see also Metrocare v. Washington Metro. Area Transit Auth.,* 679 F.2d 922, 930 n. 12 (D.C.Cir.1982) (noting that statistics can be used for both disparate impact and disparate treatment claims).

## C

■ As the plaintiffs have established a prima facie case of disparate treatment, under the second step of *McDonnell Douglas* "[t]he burden then must shift to the employer to articulate some legitimate, nondiscriminatory reason" for the challenged employment practice. *McDonnell Douglas,* 411 U.S. at 802, 93 S.Ct. 1817. Similarly, under the disparate impact provisions of Title VII, proof of a prima facie case shifts the burden to the employer to demonstrate that the challenged practice is job related and consistent with business necessity. 42 U.S.C. § 2000e–2(k)(1)(A)(i); *Griggs,* 401 U.S. at 431, 91 S.Ct. 849.

The district court, however, pretermitted any further analysis under either theory after the prima facie stage. Although it agreed that Title VII protects against discrimination "because of [an] individual's race ... or national origin," 977 F.Supp. at 442 (quoting 42 U.S.C. § 2000e–2(a)(1)), the court cut off the analysis of plaintiffs' disparate treatment claim on the ground that the discrimination here was " 'because of' citizenship, not because of membership in a Title VII protected class." *Id.* Stating that "[t]he Supreme Court held in *Espinoza v. Farah,* that ... [Title VII] does not offer protection from discrimination on the basis of citizenship," the district court held that plaintiffs had failed as a matter of law to make out a prima facie case of disparate treatment. *Id.* at 441 (citation omitted).

The district court's reliance on *Espinoza* was misplaced for two reasons. First, although the Supreme Court did hold that citizenship is not a facially-unlawful criterion for employment decisions, *see* 414 U.S. 86, 91, 94 S.Ct. 334, 38 L.Ed.2d 287 (1973), it also recognized that "an employer might use a citizenship test as a pretext to disguise what is in fact national-origin discrimination." *Id.* at 92, 94 S.Ct. 334. Title VII, the Court said, "prohibits discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin." *Id.* That principle was of no assistance to the *Espinoza* plaintiffs, who alleged discrimination based on Mexican national origin: notwithstanding the employer's citizens-only policy, there was no evidence of discriminatory purpose or effect since more than 96% of its employees were of Mexican descent. *Id.* at 93, 94 S.Ct. 334. Here, however, plaintiffs' claims of pretext and disparate effect are not as easily brushed aside: the overwhelming majority of those who receive the pay differential are whites of non-Panamanian origin. *See supra* pp. 339–40. If, as *Espinoza* proclaimed, Title VII truly does "prohibit[ ] discrimination on the basis of citizenship whenever it has the purpose or effect of discriminating on the basis of national origin," then courts must afford plaintiffs an opportunity to prove such a purpose or effect. *See also* 29 C.F.R. § 1606.5(a) (EEOC regulation) ("[W]here citizenship requirements have the purpose or effect of discriminating against an individual on the basis of national origin, they are prohibited by [T]itle VII.").

Second, "citizenship" is simply not the basis upon which the PCC differentiates, or even contends that it differentiates, among its employees. All of the plaintiffs are, in fact, American citizens. Nor is the issue whether it was lawful for the PCC to prefer citizens over noncitizens in 1976, the year the tropical differential policy was announced, or to prefer them in 1989, the year the equity package was cut off. As discussed above, the limitations period has run on those kinds of claims. Instead, the

plaintiffs' core contention is that the PCC is engaged in a current, continuing violation of Title VII, because today and every day it pays them less than it pays others who are similarly situated. The question in this case, then, is whether the PCC is unlawfully discriminating against American citizens today, by maintaining a system of preferences based on whether they were citizens at an earlier time. As the PCC itself describes its policies, it differentiates among its employees based on the *timing* of their citizenship. For that reason, *Espinoza,* a case in which the employer simply preferred citizens over noncitizens, is not controlling.

The district court cut off the analysis of plaintiffs' disparate impact claim on a different ground. Although it acknowledged that the PCC's benefit-eligibility requirements may have had a disparate impact, it dismissed the claim because plaintiffs had presented "no evidence that the Defendant acted with any unlawful discriminatory purpose." 977 F.Supp. at 442. That ruling was flawed both in law and in fact. First, "[u]nlike disparate treatment cases, disparate impact cases do not require a showing of discriminatory animus on the part of the employer." *McKenzie,* 684 F.2d at 70 n. 6 (citing *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982)); *see International Bhd. of Teamsters,* 431 U.S. at 336 n. 15, 97 S.Ct. 1843. Second, plaintiffs did present evidence of discriminatory intent. "[T]his court has squarely held that, even absent specific anecdotal evidence of discrimination, statistical proof alone may establish a prima facie case of *intentional* discrimination." *Berger,* 843 F.2d at 1413. And, as noted above, we have deemed the 1.96 standard deviations shown here to be sufficient to do so. *Id.* at 1412–13. Accordingly, the district court's conclusion that plaintiffs failed to make out a prima facie case of disparate impact, like its conclusion with respect to plaintiffs' disparate treatment case, was in error.

## D

■ The PCC offers us an alternative rationale, different from those of the district court, for concluding that plaintiffs have failed to establish a prima facie case of disparate treatment or impact. To prove disparate treatment, the PCC notes, plaintiffs must show they were treated differently from other similarly-situated members of a nonprotected class. But, the PCC contends, "appellants were only similarly situated with other locally-hired employees who became citizens after" the dates specified by the PCC as required qualifications for benefits. PCC Br. at 32 (emphasis omitted). Because plaintiffs "fail[ ] to identify a single employee of any race or national origin who was naturalized after July 3, 1976, but who nevertheless receives the tropical differential," they assertedly cannot show disparate treatment. *Id.* Similarly, because plaintiffs' statistical evidence fails to compare the treatment of protected and nonprotected employees equally "qualified" under the PCC's rules, the PCC contends plaintiffs' disparate impact case is also fatally flawed. At bottom, defendant contends plaintiffs err in "lumping all PCC employees of a particular national origin together, regardless whether they were naturalized after the date the benefits were cut off." *Id.* at 38.

The PCC is correct, of course, that plaintiffs must demonstrate they are treated less well than other employees who are similarly situated. But that does not require us to assume that the very factor plaintiffs attack as pretext is a bona fide attribute of being situated similarly. To adopt such a position would be to assume the very thing the *McDonnell Douglas* test is aimed at ferreting out—namely, whether that facially-neutral factor is indeed a pretext. To require plaintiffs to compare their situation to that of others disadvantaged by the same challenged factor would effectively eliminate their opportunity to show pretext, because it would bar them from ever passing the prima facie stage. *See Segar v. Smith,* 738 F.2d

1249, 1276 (D.C.Cir.1984) (noting that some employer qualifications "may well serve as a veil of seeming legitimacy behind which illegal discrimination is operating" and that "[i]f so, measurement of the relation of such a factor to an observed disparity would simply amount to a measure of the amount of discrimination operating through the application of the factor").

Similarly, requiring a plaintiff to "correct" his statistics to account for timing of citizenship would render the disparate impact provisions of Title VII nugatory. The gravamen of plaintiffs' disparate impact claim is that timing of citizenship *is* the factor that causes the disparate impact, whether it was intended to have that effect or not. If we were to require that the very factor that causes disparate impact be included in the comparison for purposes of establishing a prima facie case, we would effectively define disparate impact analysis out of existence. *See Berger*, 843 F.2d at 1417–18 (rejecting defendant's contention that racial disparity in union admissions could be explained by minorities' inability to satisfy union-established training requirement, since that requirement was precisely "the discriminatory practice at issue").

 It is true that in order to eliminate the most common nondiscriminatory explanation for a disparity—lack of qualifications—a plaintiff's prima facie case must take into account the "minimum objective qualifications" for the position at issue. *Segar*, 738 F.2d at 1274 (citing, inter alia, *Valentino*, 674 F.2d at 71); *Valentino*, 674 F.2d at 61 (citing *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 n. 13, 97 S.Ct. 2736, 53 L.Ed.2d 768 (1977)). But that does not mean a plaintiff must take account of every qualification recited by the employer, nor even of every "objective" qualification. Rather, what the case law means by "minimum objective qualifications" are those objective qualifications that can be shown to be truly required to do the job at issue.

The seminal disparate impact case, *Griggs v. Duke Power Co.*, makes this conclusion inescapable. There, plaintiffs contended that Duke Power's announced criteria for both hiring and transfer to better-paid jobs—a high school diploma and/or passing grade on a standardized intelligence test—had a disparate impact on black applicants. There was no dispute that these criteria were objective and "applied fairly to whites and Negroes alike." 401 U.S. at 429, 91 S.Ct. 849. Nonetheless, the Court held that plaintiffs had made out a violation of Title VII because defendant had not shown that the criteria "bear a demonstrable relationship to successful performance of the jobs for which [they were] used." *Id.* at 431, 91 S.Ct. 849. "If an employment practice which operates to exclude Negroes cannot be shown to be related to job performance," Chief Justice Burger held, "the practice is prohibited." *Id.*

Similarly, in *Dothard v. Rawlinson*, the plaintiff sought employment as a prison guard, but was rejected because she could not meet the employer's minimum height (5'2") and weight (120 lbs.) qualifications. 433 U.S. 321, 323–24, 97 S.Ct. 2720, 53 L.Ed.2d 786 (1977). She offered statistical evidence that these objective qualifications had a disproportionate impact on women, and the Court agreed that her statistics established a prima facie case—notwithstanding that the qualification standards were "facially neutral." *Id.* at 329–31, 97 S.Ct. 2720. It then went on to consider defendant's claim that it had rebutted the prima facie case by showing that the height and weight requirements were "job related" since they correlated "with the requisite amount of strength thought essential to good job performance." *Id.* at 331, 97 S.Ct. 2720. The Court rejected the rebuttal because defendant "produced no evidence" of such a correlation. *Id.* at 331–32, 97 S.Ct. 2720.

This Circuit's cases follow the same pattern. In *Goodrich v. International Brotherhood of Electrical Workers*, 712 F.2d

1488 (D.C.Cir.1983), a female employee contended that her employer paid men more than women for the same work. The employer countered that the men were paid better because they were in positions for which plaintiff could not qualify—not because she was a woman, but because she was not a union member. *Id.* at 1492. The district court granted summary judgment on that basis, finding the employer's nondiscriminatory criterion of union membership fatal to plaintiff's case. *Id.* at 1490. This court, however, reversed and remanded for trial. The purpose of a trial, we held, was to test whether union membership really provided the "special expertise" defendant claimed was necessary to succeed in the higher-paid positions. *Id.* at 1493–94.

In *Valentino v. United States Postal Service,* we did find a plaintiff's prima facie case insufficient because she "failed to take into account minimum objective qualifications," namely "specialized education and experience" required for the "high level professional, administrative, and managerial positions" at issue. 674 F.2d at 66–67. At the same time, however, we "confine[d] our analysis to [such] high level" positions, *id.* at 68 n. 16, noting that it would not apply for "jobs involving skills 'many persons possess or can fairly readily acquire,'" *id.* at 67 (quoting *Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. 2736). To the same effect is our decision in *Metrocare v. Washington Metropolitan Area Transit Authority. See* 679 F.2d at 930 ("For some jobs, no particular qualifications are needed, and an appropriate comparison group would be the local population in general. But when the posts require managerial capability or other expertise, the comparison group must be the set of available minority persons with that expertise or qualification.") (citations omitted); *see also Hazelwood,* 433 U.S. at 308 n. 13, 97 S.Ct. 2736 (noting that when "job skill" at issue is "special qualification" like teaching experience, the comparison must be "to the smaller group of individuals who possess the necessary qualifications," but that

when the skill is one like driving a truck "that many persons possess," comparison to general population is appropriate).

■ With this understanding of the meaning of the term, it is plain that the timing of an employee's citizenship is not a "minimum objective qualification" for the wage and benefit preferences at issue here. There is no sense at all in which such citizenship can fairly be said to be demonstrably "related to job performance." Having become a citizen by 1976 does not assist an employee in digging a ditch, guiding a barge, or programming a computer. The plaintiffs in this case already are employees of the PCC, and most have worked there since before 1976, all the while doing work that otherwise would "qualify" for the preference. The PCC has never suggested, let alone shown, that plaintiffs' job performance has suffered in any way because of their citizenship status.

Indeed, the PCC's own policies make clear that the timing of citizenship is not a work-related qualification. As noted in Part I, from 1984 to 1989 four plaintiffs received the PCC's equity adjustment package; yet there is no claim that their work was less acceptable than that of employees with earlier citizenship who also received the package during the same time period. *See Berger,* 843 F.2d at 1421 (holding that five-month period in which employer did not insist on employment qualification precluded claim that it was a "minimum objective qualification," and noting that employer could not rely on a qualification unless it "satisfies the bedrock requirements of job-relatedness"); *cf. Griggs,* 401 U.S. at 431–32, 91 S.Ct. 849 (noting that hiring and transfer requirements that were inapplicable to some employees who nevertheless "perform satisfactorily ... suggests the possibility that the requirements may not be needed"). Even more telling, the PCC continues to make the equity package and vacation benefits available to those who have *never* become American citizens, as long as they

were recruited from outside of Panama. *See* 22 U.S.C. § 3646; PCC Cross–Motion (R. 13), Exs. 20, 54, 67. Accordingly, it cannot be said that citizenship, let alone 1976 citizenship, is truly a job-related qualification for the PCC's pay preferences— unless by "qualification" we simply mean any qualification an employer announces.

Because the PCC has not shown that its eligibility criteria constitute "minimum objective qualifications" for the work plaintiffs do, the plaintiffs' statistical comparisons are sufficient to make out a prima facie case of both disparate treatment and disparate impact. Accordingly, summary judgment is inappropriate unless the PCC can satisfy its burden to show a legitimate nondiscriminatory reason and business necessity for the requirement. And even then, plaintiffs must be given an opportunity to show that the reason is pretextual or that there is an alternative that can satisfy the employer's need in a nondiscriminatory fashion. Because of its erroneous view of the law, the district court cut short the analysis without undertaking any of these inquiries.

## IV

The PCC argues that even if plaintiffs have established a prima facie case, it has satisfied the second step of *McDonnell Douglas* by showing "a legitimate, non-discriminatory reason for denying them benefits." PCC Br. at 33. Similarly, the Commission contends that it has met the second requirement of the disparate impact test by showing that its "criteria for awarding benefits were job-related and consistent with business necessity." *Id.* at 36. But what exactly is the defendant's explanation for its eligibility requirements?

In places in its brief, the PCC appears to suggest that the "timing of citizenship" is the legitimate, nondiscriminatory explanation for the disparities of which plaintiffs complain. The district court indicated that was its understanding as well. *See* 977 F.Supp. at 441–42. But in fact, the PCC does not rest its policy on a simple prefer-ence for long-time citizens over more recent ones. Nor is it surprising that a corporation wholly-owned by the United States government would eschew such a naked preference for one category of American citizens over another. In any event, for the reasons discussed above, the timing of citizenship cannot satisfy the "job-related" requirement of Title VII.

Rather than explain its pay disparity as the product of a preference for the timing of its employees' citizenship, the PCC ultimately rests instead on a policy of "grandfathering." PCC Br. at 34. At one time, the Commission explains, any citizen-employee was eligible for the tropical differential. Had that policy continued, plaintiffs would have become eligible when they, too, became citizens. But in 1976, the PCC stopped offering the differential to Panamanian hires. *See supra* note 2. It decided, however, to grandfather those who were receiving the differential as of that date—thus effectively retaining the benefit for employees who were citizens as of 1976, but excluding those who would become citizens at a later time. *Id.*

But re-labeling the policy as "grandfathering" cannot alone satisfy the PCC's burden of producing evidence of a nondiscriminatory reason for the practice, or of establishing a business necessity for it. Just as the employer in *Dothard* could not simply announce a height and weight policy, but rather had to show how those criteria related to the strength required for the job of prison guard, so must the PCC explain how grandfathering is related to the work of the Canal Commission.

The PCC has attempted to do that. It "preserved the benefits for those locally-hired U.S. citizens who were already receiving the benefits," the PCC explains, "in order to retain those employees." PCC Br. at 36. Grandfathering, it contends, was the "retention incentive" needed to ensure that its employees stayed on the

job. *Id.*[15]

The following sections consider the serious attacks plaintiffs have leveled at the credibility of this retention rationale. Those attacks are aimed at showing that the PCC's proffered rationale is in fact a pretext for paying benefits to its white non-Panamanian employees while denying them to black Panamanians, the great majority of whom did not become U.S. citizens until after 1976. *See supra* note 6. They also are aimed at showing defendant's policy unjustified by business necessity or achievable by plaintiffs' suggested nondiscriminatory alternative of broadening eligibility to all U.S. citizen employees. *See* Pls. Br. at 45.

### A

The PCC's retention rationale is certainly not facially illegitimate. That, however, is not the question. The question is whether the plaintiffs have cast such doubt on its credibility that a reasonable juror could regard it as pretext and infer a discriminatory motive, or that a reasonable factfinder could conclude it was inconsistent with business necessity or achievable in a nondiscriminatory way. That conclusion seems unavoidable here. As plaintiffs point out, the PCC has to date offered no evidence that its pay and benefit enhancements were ever necessary for retention in the first place, and certainly no evidence that their maintenance is necessary for *continued* retention of those who receive them. It is not as if "home" for most benefit recipients is the continental United States, and that they are thus more likely than the plaintiffs to leave Panama if they do not receive the pay differential or the free vacation flights. To the contrary, plaintiffs have proffered evidence that "home" is just as likely to be the Panamanian isthmus for the vast majority of those receiving the differential as it is for the plaintiffs.[16] Like plaintiffs, many of those who receive the benefits are second- and third-generation Canal employees. Pls. Br. at 37.

Moreover, just as the PCC has offered no support for its contention that its policies are required to ensure retention of those who receive the preferential benefits, it has offered no evidence to suggest that retention of employees like the plaintiffs is any less important to its business. Nor has it offered evidence that the benefits are any less necessary for retention of the plaintiffs. Indeed, one of the plaintiffs has already quit the PCC and moved to Florida. *Id.* at 39.

### B

The biggest problem with the retention rationale, however, is that even if accepted, it can only explain half of the PCC's eligibility criteria. Although the Commission stresses the criterion of date-of-citizenship as consistent with a grandfathering rationale, the plaintiffs correctly point out that none of the three benefit programs is actually limited to employees who were citizens as of a certain date. Timing of citizenship is one way to qualify, but it is not the only way. As the PCC concedes, the tropical differential is also available to "new hires" from outside of Panama, regardless when they became citizens. PCC Br. at 5–6; *see* 35 C.F.R. § 251.31(b)(1)(i). And the equi-

---

**15.** The PCC also implies a second rationale for grandfathering, namely, "to preserve the morale of innocent employees who are victims of lowering wage scales." PCC Br. at 34 (quoting *Canton v. Canal Zone Gov't,* 522 F.Supp. 1, 12 n. 17 (D.C.Z.1981) (discussing concept in a different context)). But the PCC does not stress this point, no doubt because the response is obvious: Why, a reasonable juror might ask, is the morale of those who receive the benefit more important than the morale of the plaintiff employees? And why are the plaintiffs any less "innocent"?

**16.** The PCC's own survey showed that 429 of the 464 employees who were receiving the tropical differential in 1995 were already residing in Panama at the time they were recruited to work for the Commission. Only 35 were recruited from off-isthmus. Pls. Stmt. of Material Facts (R. 9) ¶ 27 (citing Regist Decl. ¶ 14 & Attach. A); Pls. Br. at 38.

ty package and travel benefits are available to new hires from outside of Panama, even if they *never* become American citizens. *See* 22 U.S.C. § 3646; PCC Cross–Motion (R. 13), Exs. 20, 54, 67.

Needless to say, PCC's new-hire criterion cannot be explained by a retention rationale, since the new hires never previously worked for the company. For this criterion, the PCC must turn to a different "legitimate, nondiscriminatory reason." The new-hire criterion is justified, the Canal Commission contends, because it is needed for "recruiting" employees. PCC Br. at 34.

Like retention, there is nothing inherently suspect about a recruitment rationale. But as the plaintiffs note, to date the PCC has not offered any evidence that the benefits contested here are or were necessary for recruitment. Where is the evidence, they ask, that the base salaries offered by the PCC are or were insufficient to recruit the necessary workforce? Where is the evidence that the PCC has even considered the question? Indeed, plaintiffs point out that the only evidence in the record is to the contrary, i.e., that the PCC has (and has had) no need for off-isthmus recruitment at all. An affidavit from the PCC's own Personnel Director explains that the reason the tropical differential was originally dropped in 1976 was that "in general, there were sufficient numbers of qualified applicants available locally that made it unnecessary to grant the differential to all U.S. citizens as a recruitment and retention incentive." Pls. Br. at 40 (quoting Mercier Aff.); *see also* Comptroller General, Report to the Subcommittee on Panama Canal 102 (1975) (noting that the tropical differential was not needed for across-the-board recruitment because "[q]ualified applicants ... are available locally for most skills") (quoted in Pls. Br. at 37).

## C

The equity adjustment package presents a particularly good example of the weakness, and shifting nature, of the rationales defendant offers in support of its benefit policies. As part of the Panama Canal Treaty negotiations, the United States agreed that in 1984 it would close commissaries that previously had offered goods to PCC citizen-employees at discounted prices. PCC Br. at 6–7; Pls. Br. at 14. To offset the increase in employee cost-of-living attributable to closure, Congress authorized the PCC to pay a cost-of-living allowance. Congress authorized payment to "each officer and employee ... who *is* a citizen of the United States and was employed by the Panama Canal Company ... on September 30, 1979," regardless of place of recruitment, as well as to anyone recruited "outside the Republic of Panama" after that date, regardless of citizenship. 22 U.S.C. § 3646 (emphasis added). Under that provision, between 1984 and 1989 the PCC paid the equity adjustment package to five of the plaintiffs.

On December 29, 1989, as one his final acts before departing Panama, the last American administrator of the Canal terminated the equity adjustment package for any employee originally hired from within Panama who was not a citizen before October 1, 1984. As a result, four plaintiffs lost their benefits. As they quite rightly note, the PCC has not shown how the need to provide retention incentives explains the *termination* of their benefits. Indeed, cancellation is arguably inconsistent with that grandfathering-based rationale.

Unable to rely on a grandfathering/retention rationale, the PCC turns instead to another: the equity adjustment package, the PCC contends, "was meant *only* to compensate employees who had lost [commissary] benefits." PCC Br. at 8 (emphasis added). Because plaintiffs were not citizens during the period the commissaries were open, they "never received any [commissary] benefits." *Id.* Hence, the PCC contends, plaintiffs should never have been given the equity adjustment package in the first place, and the Commission was justified in terminating the undeserved

"windfall" they had been receiving for four years. *Id.*

But this compensation explanation appears inconsistent with the new-hires eligibility criterion discussed above. If the equity allowance were meant *only* for those who previously had the benefit of shopping at the commissaries, why does the PCC make it available to those whom the Commission newly hires from outside of Panama? Those new hires, by definition, never received the pre-1984 commissary benefits. And why does the PCC extend this offer to new hires only if they do not come from Panama?

To respond, the PCC retreats to a variant of the recruitment rationale: "Although these [newly-hired] employees never received any [commissary] benefits, they receive the equity package as compensation for the loss of access to goods and services they received before coming to Panama." *Id.* at 8. In other words, and swallowing its previous words, the PCC contends that the equity adjustment package was really not "meant only to compensate employees who had lost" commissary benefits, *id.* at 8; it was also meant to compensate newly-hired employees who had lost the benefit of lower-priced goods in their home countries. The plaintiffs are not eligible on this theory either, the PCC insists, because they have always "had to pay Panamanian prices, for Panamanian goods, from a Panamanian wage." *Id.* (quoting *Anderson,* 977 F.Supp. at 441 n. 2).

The plaintiffs cast substantial doubt on the credibility of this new compensation/recruitment explanation as well. Where is the evidence, they ask, that the new hires did pay lower prices at home? Where is the evidence that the PCC ever conducted the kind of cost comparison that would justify such a policy? To date, the PCC has offered no evidence on either score. This is hardly surprising since at bottom the PCC's across-the-board policy—in which every new non-Panamanian hire is eligible but no Panamanian hire ever is—

appears to rest on the unlikely proposition that Panama has (and has long had) the highest cost of living in the world.

Finally, plaintiffs point to another flaw in the PCC's proffered rationale. Notwithstanding its references to a "new hires" criterion, the PCC is actually rather expansive in its definition of the word "new." It not only makes the equity adjustment package available to those newly-hired from offisthmus, it also makes it available to anyone, citizen or not, hired from outside of Panama *after September 30, 1979. See* 22 U.S.C. § 3646; PCC Cross–Motion (R. 13), Exs. 20, 54. On the PCC's rationale, how can it justify providing the package to these not-new, not-citizen hires? Like the plaintiffs, they never received the original commissary benefits (because they were not citizens during the commissary period), making the grandfathering/retention rationale inapplicable. But also like the plaintiffs, these hires were not enjoying the benefit of lower-cost goods in their home countries when the commissaries closed in 1984. Just like the plaintiffs, they were working in Panama, "pay[ing] Panamanian prices, for Panamanian goods, from a Panamanian wage" from 1979 to 1984. Hence, the compensation/recruitment explanation is also unavailable. A reasonable factfinder could therefore conclude that only one remaining line divides these employees from the plaintiffs: they are not of Panamanian national origin. That, however, is precisely the line the law forbids the PCC to draw.

## V

The preceding analysis persuades us that the district court erred in granting summary judgment and dismissing plaintiffs' Title VII complaint. With respect to the claim of disparate impact, we have noted that the court erred in ruling that proof of discriminatory intent was required. Accordingly, because Part III establishes that plaintiffs' statistical evidence is sufficient for a prima facie case, and Part IV establishes that on the present

record a reasonable factfinder could find defendant's pay policies unjustified by business necessity (or rebutted by plaintiffs' as-yet unchallenged alternative of broadening eligibility to all U.S. citizen employees), reversal of summary judgment on the disparate impact claim is required.

■ For plaintiffs' disparate treatment charge to reach the jury, they must show that a reasonable juror could find intentional discrimination. *Aka*, 156 F.3d at 1289–90. In deciding whether intentional discrimination can be inferred, the court considers "the combination of (1) the plaintiff's *prima facie* case; (2) any evidence the plaintiff presents to attack the employer's proffered explanation for its actions; and (3) any further evidence of discrimination that may be available to the plaintiff." *Id.* at 1289.

■ Part III demonstrates that when properly evaluated, the plaintiffs' prima facie case of disparate treatment is strong. Not only have plaintiffs shown they were treated differently from similarly-situated, white non-Panamanians, but they have shown the statistical disparities to be large—large enough alone to permit an inference of discriminatory intent. Similarly, Part IV demonstrates that plaintiffs' attack on the PCC's proffered explanations for that treatment is also strong, providing a reasonable basis for viewing them as pretexts. As we recognized in *Aka v. Washington Hospital Center*, such a discrediting of an employer's explanations "may, together with the elements of the prima facie case, suffice to show intentional discrimination." 156 F.3d at 1293 (quoting *St. Mary's Honor Ctr. v. Hicks*, 509

U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993)). In this case, they plainly do suffice. Hence, we need not even consider plaintiffs' proffer of further evidence that the PCC's eligibility criteria represent "nothing more than a thinly veiled continuation of the 'gold' and 'silver' system that segregated native-born white U.S. citizen employees from black employees by pay and every other aspect of Canal life"—a contention plaintiffs will have the opportunity to prove at trial. Pls. Br. at 9; *see McKenzie*, 684 F.2d at 72 ("Evidence of past practices may illuminate present statistics, or present patterns of behavior."). Because on the current record it is impossible to conclude that no reasonable juror could find intentional discrimination, the grant of summary judgment on the disparate treatment claim must also be reversed.

Of course, plaintiffs' attack on defendant's rationales for its wage and benefit policies may in the end prove mistaken. So far, however, plaintiffs' contentions stand largely unrebutted because the district court did not require the Canal Commission to offer a rebuttal in order to keep plaintiffs from a trial. On remand the Commission will have the opportunity, and the obligation, to do so.

*Reversed and remanded.*